

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-1998

# Iberia Foods Corp v. Romeo

Precedential or Non-Precedential:

Docket 97-5424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Iberia Foods Corp v. Romeo" (1998). *1998 Decisions.* Paper 178.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/178

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5424

IBERIA FOODS CORP.

v.

ROLANDO ROMEO, JR.
d/b/a ROL-ROM FOODS

Rolando Romeo, Jr., t/a
Rol-Rom Foods,

      Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 93-cv-01690)

Argued Monday, April 27, 1998

BEFORE: ALITO, RENDELL and GARTH,
Circuit Judges

(Opinion filed July 30, 1998)

        Stephen L. Baker (Argued)
        Stephen L. Baker, P.A.
        359 East Main Street
        Somerville, New Jersey 08876

        Attorney for Appellant

John G. Gilfillan, III (Argued)
Kenneth L. Winters
Carella, Byrne, Bain, Gilfillan,
Cecchi, Stewart & Olstein
6 Becker Farm Road
Roseland, New Jersey 07068

Attorneys for Appellee

OPINION OF THE COURT

GARTH, Circuit Judge:

This is a trademark action brought by Iberia Foods against Rolando Romeo, Jr. and his company, Rol-Rom Foods (collectively, "Rol-Rom"), to enjoin Rol-Rom's sale of household cleaning products under the Mistolin trademark owned by Iberia. The district court granted summary judgment in favor of Iberia, and Rol-Rom has appealed. Because the Mistolin products sold by Rol-Rom are "genuine" under Section 32 of the Lanham Act, 15 U.S.C. S 1114, we will reverse.

I.

Iberia Foods is a Brooklyn-based wholesale distributor of grocery store products that owns the United States trademark to Mistolin household cleaners. The line of Mistolin products includes soaps, tile cleaners, and laundry detergents, and is offered for sale at grocery stores and supermarkets both in Puerto Rico and in certain metropolitan areas in the United States for a few dollars a bottle.

Mistolin products are manufactured exclusively in Puerto Rico by Mistolin Caribe, Inc. ("Caribe"). In addition to selling Mistolin to Iberia for resale in the United States, Caribe markets Mistolin directly to distributors in Puerto Rico for resale in the Puerto Rican market. Although both Iberia and Caribe sell Mistolin products, the two companies service entirely separate markets: Caribe sells Mistolin only in Puerto Rico to Puerto Rican distributors, and Iberia sells Mistolin only in the continental United States.

The business arrangement between Iberia and Caribe dates back to 1988, when Iberia acquired the United States trademark to Mistolin from Caribe's parent company, Mistolin Dominicana, C.A. ("Dominicana").1 Although the legal effect of the 1988 agreement is disputed, its terms granted Iberia "all the rights, title and interest in and to [the Mistolin] trademark insofar as they relate to the United States." In exchange for ownership of the Mistolin trademark, Iberia agreed to purchase Mistolin exclusively from Caribe.

The defendant in this case, Rol-Rom Foods, is a New Jersey-based distributor of household cleaning products that purchases Mistolin products on the open market in Puerto Rico and sells them in New York and New Jersey. Although Rol-Rom has never purchased Mistolin products directly from Caribe, it is undisputed that the Mistolin sold by Rol-Rom was originally sold by Caribe for resale in the Puerto Rico market. By obtaining Mistolin in Puerto Rico and selling it in New York without Iberia's involvement, Rol-Rom has been able to offer Mistolin for sale in direct competition with Iberia at a substantial discount from Iberia's price.

II.

In April 1993, Iberia filed a four count complaint against Rol-Rom seeking injunctive relief and damages. The principal count in the complaint alleged that Rol-Rom's sale of Mistolin products constituted infringement of Iberia's trademark in violation of S 32 of the Lanham Act, codified at 15 U.S.C. S 1114.2 Rol-Rom's answer denied that it had infringed Iberia's mark, alleged several affirmative defenses, and added a number of counterclaims. Following discovery,

_____

1. Although Caribe is technically a subsidiary of Dominicana, for the sake of simplicity we will refer to Caribe rather than Dominicana when discussing the 1988 agreement. This substitution has no effect on our resolution of this appeal.

2. The remaining counts against Rol-Rom alleged violations of common law trademark and service mark infringement, common law unfair competition, and New Jersey statutory unfair competition under N.J.S.A. 56:4-1.

both parties moved for summary judgment on the federal trademark infringement count.

Before the district court on summary judgment, Iberia argued that Rol-Rom had clearly infringed Iberia's trademark. According to Iberia, the 1988 agreement between Iberia and Caribe had transferred the rights to the Mistolin trademark in the continental United States to Iberia, but had allowed Caribe to retain the trademark rights to Mistolin in Puerto Rico. By buying Mistolin in Puerto Rico and selling it in the continental United States, Iberia contended, Rol-Rom had circumvented the quality control measures enforced by Iberia on all the Mistolin products it sold. Accordingly, Iberia claimed, Rol-Rom's Mistolin was not "genuine," and Rol-Rom's sales constituted infringement of Iberia's trademark because it injured the goodwill Iberia had invested in the mark.

Rol-Rom's view of the case contrasted sharply with Iberia's. According to Rol-Rom, the 1988 agreement had transferred all of Caribe's United States trademark rights to Iberia. Because Puerto Rico is considered part of the "United States" for the purpose of federal trademark law, see 15 U.S.C. S 1127, Rol-Rom claimed that the 1988 agreement had granted Iberia the Mistolin trademark rights in Puerto Rico as well as in the continental United States. According to Rol-Rom, Iberia's longstanding failure to challenge Caribe's sales of Mistolin to Puerto Rican distributors provided Rol-Rom with two affirmative defenses to Iberia's action. First, Rol-Rom argued that Iberia's failure to exercise control over its mark constituted a "naked license" that had led to de facto abandonment of the Mistolin trademark.3 Second, Rol-Rom claimed that Iberia had impliedly consented to Caribe's sales of Mistolin in Puerto Rico, such that Iberia had relinquished its

_____

3. Rol-Rom's pleadings describe its abandonment argument as a counterclaim, rather than as an affirmative defense. Abandonment, however, is generally considered an affirmative defense to infringement, rather than the type of actionable wrong that would sustain an independent claim or counterclaim. See, e.g., Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1075-76 (5th Cir.), cert. denied, 118 S. Ct. 299 (1997). For the sake of simplicity, we will refer to Rol-Rom's abandonment argument as an affirmative defense.

trademark rights to the Mistolin sold by Rol-Rom pursuant to the "first sale" or "exhaustion" doctrine.4

On March 26, 1996, the district court entered an order denying Rol-Rom's motion for summary judgment and granting Iberia's summary judgment motion. Addressing Rol-Rom's defenses first, the district court held that Rol-Rom's first sale and abandonment defenses were meritless because the uncontroverted evidence in the record made clear that neither Caribe nor Iberia had intended that Iberia would possess the right to prevent Caribe from marketing Mistolin in Puerto Rico. When Caribe and Iberia had agreed to transfer the Mistolin trademark rights to Iberia "insofar as they relate to the United States," the district court held, they had intended to transfer only the rights covering the continental United States, where Iberia was already distributing Mistolin products. Because Iberia had no right to control Caribe's sales of Mistolin in Puerto Rico, it had no ability either to authorize Caribe's "first sale" of Mistolin or to grant Caribe a "naked license" to sell it in Puerto Rico. Accordingly, the district court held that the first sale (exhaustion) and abandonment doctrines were inapplicable. In any event, the district court noted, the Mistolin trademark had clearly not been abandoned because the mark continued to have significance among purchasers in the continental United States.

Having dispensed with Rol-Rom's affirmative defenses, the district court turned to Iberia's motion for summary judgment. Here, the district court referenced its prior discussion of Iberia's view that the Mistolin sold by Rol-Rom was not "genuine" because it never passed through Iberia's post-manufacture quality controls. In that discussion, the district court had also noted the presence of "record evidence showing that [Iberia] has in fact instituted some quality control procedures over products it received from

_____

4. According to the "first sale" or "exhaustion" doctrine, a trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain control over who buys, sells, and uses the product in its authorized form. See, e.g., Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1076 (9th Cir. 1995).

Caribe." In its motion for summary judgment, Iberia argued that this evidence entitled Iberia to summary judgment on its federal trademark infringement count. The district court agreed, although it did not specify the basis for its implicit conclusion that Rol-Rom's Mistolin was not "genuine."

The litigation regarding Iberia's remaining claims and Rol-Rom's counterclaims continued until June 4, 1997, when the district court acceded to the parties' request to enter a final order and injunction that would allow Rol-Rom to pursue an appeal without further delay. The final order enjoined Rol-Rom from selling Mistolin products that had not first been distributed by Iberia, and ordered that if Rol-Rom violated the injunction it would be held in contempt, fined, and forced to pay Iberia's attorney's fees. Further, the final order stated that Rol-Rom's counterclaims and Iberia's claim for damages were withdrawn with prejudice, subject to the right of the parties to reinstate their claims if the district court's March 26, 1996 were to be reversed on appeal.[5]

Rol-Rom filed a timely appeal. We will reverse.

III.

On summary judgment, we exercise plenary review, construing all evidence and resolving all doubts raised by affidavits, depositions, answers to interrogatories, and admissions on file in favor of the non-moving party. See SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997). Our task is to identify and explain the substantive law governing the action, and then in light of that law determine whether there is a genuine dispute over dispositive facts. See Ciarlante v. Brown & Williamson

_____

5. Although we need not reach such issues to resolve Iberia's S 32 claim, we think it is proper in light of the district court's arrangement and our remand to note that we agree with the district court's conclusion that the 1988 agreement transferred to Iberia only those trademark rights relating to the continental United States. Thus, we agree with the district
court that Iberia owns the trademark rights to Mistolin in the continental United States; that Caribe retains the rights to Mistolin in Puerto Rico; and that Rol-Rom's abandonment and "first sale" arguments are meritless.

6

Tobacco Corp., 143 F.3d 139, 145 (3rd Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986)). If upon review of cross motions for summary judgment we find no genuine dispute over material facts, then we will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts. See Ciarlante, 143 F.3d at 145–46.

IV.

Although the parties have devoted their attention to the merits of Rol–Rom's affirmative defenses, we consider the primary question raised by this appeal to be one addressed only in passing by the parties. The question is: has Iberia established that the Mistolin sold by Rol–Rom is not "genuine" according S 32 of the Lanham Act? Because we conclude that Iberia has failed to establish that the Mistolin sold by Rol–Rom is not "genuine," we hold that Rol–Rom is entitled to summary judgment, and that the order of the district court must be reversed.

A.

Iberia's federal trademark claim proceeds under S 32 of the Lanham Act, 15 U.S.C. S 1114.6  Under the sway of Justice Holmes's landmark opinion in A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S. Ct. 244 (1923), courts have construed this statute to grant trademark owners the right to enjoin the sale of products containing the owner's

_____

6. This statute states in relevant part that:

       (1) Any person who shall, without the consent of the registrant––

       (a) use in commerce any reproduction, counterfeit, copy, or colorable
       imitation of a registered mark in connection with the sale, offering
       for sale, distribution, or advertising of any goods or services on or
       in connection with which such use is likely to cause confusion, or
       to cause mistake, or to deceive . . .

        . . . shall be liable in a civil action by the registrant for the
       remedies hereinafter provided.

15 U.S.C. S 1114 (1997).

authentic mark when the products offered for sale are similar but not identical to those offered by the trademark owner. The need for such protection has arisen most often in the context of so-called "gray goods" cases. In such cases, holders of United States trademarks affixed to products manufactured abroad have used S 32 of the Lanham Act as a means of preventing the sales of inferior parallel imports. See, e.g., Original Appalachian Artworks, Inc. v. Granada Elecs., Inc., 816 F.2d 68 (2d Cir. 1987) (owner of Cabbage Patch Kids trademark entitled to injunctive relief from sales in United States of Spanish version of dolls without "adoption" feature). The scope of the action is not limited to gray goods cases, however. The same theory has been used to enjoin the sale of domestic products in conditions materially different from those offered by the trademark owner. See, e.g., Warner-Lambert Co. v. Northside Dev. Co., 86 F.3d 3 (2d Cir. 1996) (owner of Halls cough drops trademark entitled to injunction against sale of Halls cough drops past their expiration date).

As a matter of doctrine, a trademark owner attempting to use S 32 to prevent an infringement must establish that the products sold by the alleged infringer are not "genuine." See, e.g., Weil Ceramics and Glass, Inc. v. Dash, 878 F.2d 659, 671-73 (3d Cir. 1989); El Greco Leather Prod. Co. v. Shoe World, Inc., 806 F.2d 392, 395-99 (2d Cir. 1986); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107-08 (4th Cir. 1991). The test for whether an alleged infringer's products are genuine asks whether there are "material differences" between the products sold by the trademark owner and those sold by the alleged infringer. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 638 (1st Cir. 1992); Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, 112 F.3d 1296, 1302 (5th Cir. 1997). If there are no material differences between the products sold, then the products offered by the alleged infringer are "genuine" and an infringement action under S 32 of the Lanham Act must fail. Whether differences are material so that an alleged infringer's products are non-genuine is a matter of law that we review de novo. See El Greco, 806 F.2d at 395; Casa Helvetia, 982 F.2d at 642, 642 n.9.

The purpose of the material differences test is to determine whether the allegedly infringing products are likely to injure the goodwill developed by the trademark owner in the trademarked goods. See Weil Ceramics, 878 F.2d at 671. When the products sold by the alleged infringer and the trademark owner contain identical marks but are materially different, consumers are likely to be confused about the quality and nature of the trademarked goods. See Casa Helvetia, 982 F.2d at 641. Characteristics of the alleged infringer's goods that are not shared by the trademark owner's goods are likely to affect consumers' perceptions of the desirability of the owner's goods. See Weil Ceramics, 878 F.2d at 671; Martin's Herend, 112 F.3d at 1302. Sales of the alleged infringer's goods will tarnish the "commercial magnetism" of the trademark, injuring the trademark owner. Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205, 62 S. Ct. 1022, 1024 (1942) (Frankfurter, J.).7 In such circumstances, the alleged

_____

7. A few examples may prove helpful here. In Original Appalachian Artworks, Inc. v. Granada Elecs., Inc., 816 F.2d 68 (2d Cir. 1987), the Second Circuit granted an injunction to the owner of the United States trademark for Cabbage Patch Kids dolls against the importation of Cabbage Patch Kids dolls manufactured in Spain for the Spanish market. Although the Spanish dolls looked very similar to the domestic ones, the Spanish dolls lacked certain features (in particular, the ability to be "adopted" by the owner) that had sparked consumer interest and sales in the United States. The court held that the domestic trademark owner was entitled to an injunction because the domestic trademark owner's goodwill was injured by consumer association of its mark with the less desirable Spanish dolls. See 816 F.2d at 73.

In Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 638 (1st Cir. 1992), the First Circuit granted an injunction to the owner of the United States trademark for Italian-made Perugina chocolates against the parallel importation of Venezuelan-made Perugina chocolates. The court catalogued a series of differences between the Venezuelan imports and the products sold by the trademark owner, including differences in the composition of the chocolate, the packaging, the price, and the conditions under which the chocolates were transported and stored. The court held that the differences were likely to result in consumer confusion and that the trademark owner was entitled to injunctive relief. See 982 F.2d at 644.

9

infringer's goods are considered "non-genuine" and the sale
of the goods constitutes infringement.

In contrast, when the differences between the products
prove so minimal that consumers who purchase the alleged
infringer's goods "get precisely what they believed that they
were purchasing," Weil Ceramics, 878 F.2d. at 672,
consumers' perceptions of the trademarked goods are not
likely to be affected by the alleged infringer's sales. See
Casa Helvetia, 982 F.2d at 641. Although consumers may
be unaware of the precise avenues that a given product has
traveled on its way to the supermarket shelf, the authentic
trademark on the alleged infringer's goods is an accurate
indicator of their nature and quality. Cf. Prestonettes, Inc.
v. Coty, 264 U.S. 359, 368, 44 S. Ct. 350, 351 (1924).
Thus, the goods may be considered "genuine." This does
not mean that the trademark owner suffers no economic
harm from the alleged infringers' sales, but it does mean
that S 32 of the Lanham Act does not offer a remedy to the
trademark owner. See Weil Ceramics, 878 F.2d. at 672.

Because consumer preferences are as fickle and diverse
as the human imagination, it is impossible to devise an
exhaustive list of the types of differences between products
that can be considered material for the purposes of the
genuineness test. Compare Granada Elecs., 816 F.2d at 73
(holding that imported Cabbage Patch Kids dolls are
materially different from domestic dolls because imported
dolls cannot be "adopted" by domestic owners) with Shell
Oil, 928 F.2d at 107-08 (holding that bulk oil purchased

_____

Finally, in Martin's Herend Imports, Inc. v. Diamond & Gem Trading
USA, 112 F.3d 1296, 1302 (5th Cir. 1997), the Fifth Circuit enjoined the
parallel importation of Hungarian Herend porcelains brought to the
United States over the objections of the United States trademark owner.
The court held that there were material differences between the
porcelains sold by the trademark owner and the alleged infringer
because the trademark owner had chosen to sell only select items in the
United States. The alleged infringer, in contrast, sold many items that
were not offered by the trademark owner. In light of the delicate task of
maintaining goodwill in high-end artistic products, the court held, this
difference was enough to entitle the United States trademark owner to
an injunction against the parallel importation. See 112 F.3d at 1302.

from Shell and resold by oil wholesaler was not genuine because it was not stored according to Shell's specifications). Any differences that are likely to damage the goodwill developed by the trademark owner can be deemed material.

B.

Iberia argues that material differences exist between the Mistolin sold by Rol-Rom and that sold by Iberia because Iberia conducts a "quality control" inspection of every shipment of Mistolin on receipt from Caribe. [8] According to the record, Iberia inspects every box of Mistolin it receives, and rejects products that do not meet its specifications. Iberia contends that its rejection of substandard goods has raised the quality of the Mistolin sold by Iberia so that it is materially different from the uninspected Mistolin sold by Rol-Rom.

When a trademark owner arranges to have its mark placed on a product manufactured by another company, the owner's rigorous quality control and inspection procedure on receipt from the manufacturer has often been recognized as the basis of a material difference between products sold by the trademark owner and those offered by another company without the trademark owner's stamp of approval. See, e.g., El Greco, 806 F.2d at 395 (shoes); Casa Helvetia, 982 F.2d at 642 (chocolates). The reason for this is evident. Because the quality of a manufacturer's output can be uneven, and consumers can be expected over time

_____

8. In the "Statement of the Case" portion of its brief, Iberia remarks in passing that Rol-Rom has sold Mistolin products, and in particular, Mistolin All Purpose Cleaner, "which Iberia has discontinued and/or has determined not to sell under the Mistolin mark." Appellee's Br. at 8. Were this statement supported in the record, it might have provided the basis for a material difference between the Mistolin products sold by Iberia and Rol-Rom. See, e.g., Martin's Herend, 112 F.3d at 1302 (holding that parallel importer's porcelain figurines were materially different from trademark owner's figurines because "at least 50 percent" of the figurines sold by the parallel importer were not sold by trademark owner). Here, however, the record fails to support Iberia's statement: the record indicates that both Iberia and Rol-Rom discontinued selling Mistolin All Purpose Cleaner. See App. 167 (Iberia); App. 281 (Rol-Rom).

11

to notice the quality of the products they purchase, a trademark owner's inspection on receipt from the manufacturer may be a necessary part of maintaining consumer goodwill associated with its mark. Cf . Casa Helvetia, 982 F.2d at 643.

Because quality control measures may create subtle differences in quality that are difficult to measure but important to consumers, courts do not require trademark owners to show that the actual quality of the inspected goods is measurably higher than that of the uninspected goods. See, e.g., El Greco, 806 F.2d at 395; Shell Oil, 928 F.2d at 107. At the same time, "quality control" is not a talisman the mere utterance of which entitles the trademark owner to judgment. See, e.g., Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78–80 (2d Cir. 1994) (rejecting trademark owner's claim of infringement based on circumvention of owner's quality control efforts). Rather, the test is whether the quality control procedures established by the trademark owner are likely to result in differences between the products such that consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill. See Warner–Lambert Co. v. Northside Dev. Co., 86 F.3d 3, 6 (2d Cir. 1996) (trademark holder must show that it uses substantial and nonpretextual quality control procedures such that non-conforming sales will diminish the value of the mark).

According to Jesus Garcia, the chairman of the board of Iberia, Iberia's inspection of Mistolin upon receipt from Caribe consists of looking for "external self–evident problems." App. 139. First, the exterior packaging of the deliveries is inspected to make sure that the boxes are not damaged. Second, an Iberia employee takes a "random sample" of Mistolin and looks at it. If the packaging is damaged or there is "something wrong" with the sample, Iberia destroys the goods and receives credit from Caribe. Iberia has no standard explaining when there is"something wrong" with a sample, however: the employee simply looks at the Mistolin and smells it to determine whether or not it seems "off." Although Garcia stated in his deposition that Iberia sends products to a laboratory for inspection if something seems "wrong" with a shipment of Mistolin,

12

Garcia could not recall any time within the previous ten years when this was actually done. App. 136-40.

The reason that Iberia's inspection is limited to looking for obvious defects is that since acquiring the trademark in 1988, Iberia has never made any efforts to learn how Caribe manufactures Mistolin products or what ingredients they contain. App. 92 ("Iberia Foods Corp. has no knowledge as to what are the contents or ingredients used in the products manufactured by Mistolin Caribe Inc.") (statement of Jesus Garcia). Iberia simply orders Mistolin products from Caribe, and assumes that the bottles it receives contain "Mistolin" cleaner. In fact, Iberia's sole participation in the design or manufacture of any Mistolin product entailed helping Caribe design new U.S. labels when federal law began mandating that labels contain new product warnings. App. 147-48. Otherwise, everything about Mistolin, from its ingredients to the U.P.C. symbols placed on its bottles, has been determined by Caribe. The result of Iberia's "hands off " approach is that its quality control process is limited to determining whether the Mistolin products it receives from Caribe have been damaged during shipment, and whether random samples look and smell "right."9

We conclude that Iberia's quality inspections are insufficient to create a material difference between the inspected Mistolin sold by Iberia and the uninspected Mistolin sold by Rol-Rom. By limiting its inspection to "self-evident" defects, Iberia does no more than weed out those bottles of Mistolin that are entirely unsaleable on the open market. This "weeding out" is insufficient because bottles so obviously defective as to be unmarketable are not likely to reach consumers in any event. First, distributors will generally try to catch such blatant defects to keep their

_____

9. In the one instance in which Iberia rejected Mistolin sent by Caribe for
a defect that was not obvious, Garcia conceded that the defect had not been discovered during Iberia's inspection. This occurred in 1993, when Caribe sent Iberia a shipment of Mistolin that looked normal when it first arrived, but later deteriorated in the bottle. Although Garcia did not explain how this defect was eventually discovered, he did state that it was not detected when the shipment underwent Iberia's quality control procedures. App. 136.

retailers happy: this is as true when the distributor happens to be the trademark owner as when the distributor is another company such as Rol-Rom. See App. 285 ("[W]e don't sell anything that's damaged or broken . . . because our clients wouldn't stand for it.") (statement of Rolando Romeo, Jr.). Those defects that do pass by the distributors will be caught by retailers, who are unlikely to place broken bottles of Mistolin on their shelves if they expect to stay in business for long. Because unmarketable Mistolin products will not generally reach consumers regardless of whether Iberia catches the defects first, Iberia's limited inspection is insufficient to create a material difference between the Mistolin offered to consumers through Iberia and that offered to consumers through Rol-Rom.

The limited scope of the inspection performed by Iberia distinguishes this case from other cases in which a trademark owner's quality control mechanism created a material difference between the products offered by the trademark owner and the alleged infringer. In those cases, the trademark owner's inspection reflected a deliberate effort to ensure that the quality of the product matched the high standards set by the trademark owner. For example, in El Greco, the trademark owner's agent would inspect the manufacturer's product before shipment. Unless the agent issued an inspection certificate stating that the manufacturer's goods fully complied with the trademark owner's standards and specifications, the goods were never shipped to the trademark owner for sale. See 806 F.2d at 395. In Casa Helvetia, the trademark owner conducted laboratory tests on the chocolates it received from the Italian manufacturer, destroyed those chocolates that were beyond a fixed expiration date, and transported its products in special refrigerated containers. Even the alleged infringer conceded that its quality control procedures differed "radically" from the strict regimen followed by the trademark owner to maintain the quality of the products sold. See 982 F.2d at 642-43.

In both El Greco and Casa Helvetia, the trademark owner's inspection was an integral part of a careful effort to ensure that the quality of the product matched the high standards set by the trademark owner. Circumventing that

14

inspection threatened the trademark owner's efforts to maintain the goodwill that consumers associated with the mark. In this case, however, Iberia has hardly set any standard at all: rather, it has deferred almost entirely to Caribe's judgment of what Mistolin products are and how they are to be manufactured. Iberia's "hands off " approach has reduced its quality control inspection to a de minimis check designed to make sure that the products it receives from Caribe are not obviously unmarketable. We are satisfied that such an inspection is insufficient to create a material difference between the products sold by Iberia and those sold by Rol-Rom.

V.

Because there is no material difference between the Mistolin sold by Iberia and that sold by Rol-Rom, we hold that the Mistolin sold by Rol-Rom is "genuine" and that Iberia's attempt to use S 32 of Lanham Act to block Rol-Rom's sales must fail. Because buyers of Rol-Rom's Mistolin get precisely what they believe that they are purchasing, see Weil Ceramics, 878 F.2d at 672, the goodwill associated with Mistolin products is not harmed by Rol-Rom's sales.

We therefore reverse so much of the district court's June 4, 1997 order as entered judgment for Iberia on the federal trademark infringement count, and direct the district court to enter judgment for Rol-Rom on this count. Pursuant to the terms of the June 4, 1997 order, which directed the reinstatement of remaining claims if the district court's order were reversed, we will remand to the district court for further appropriate proceedings.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit