*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRILLIANCE AUDIO, INC.,

        *Plaintiff-Appellant,*

    *v.*

HAIGHTS CROSS COMMUNICATIONS, INC., *et al.*,

        *Defendants-Appellees.*

No. 05-1209

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00396—Gordon J. Quist, District Judge.

Argued: December 2, 2005

Decided and Filed: January 26, 2007

Before: KENNEDY and GIBBONS, Circuit Judges; DONALD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Terence J. Linn, VAN DYKE, GARDNER, LINN & BURKHART, Grand Rapids, Michigan, for Appellant. R. David Hosp, GOODWIN PROCTER, Boston, Massachusetts, for Appellees. **ON BRIEF:** Terence J. Linn, Timothy A. Flory, Karl T. Ondersma, VAN DYKE, GARDNER, LINN & BURKHART, Grand Rapids, Michigan, for Appellant. R. David Hosp, Mark S. Puzella, GOODWIN PROCTER, Boston, Massachusetts, for Appellees.

GIBBONS, J., delivered the opinion of the court, in which DONALD, D. J., joined. KENNEDY, J. (p. 8), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant Brilliance Audio ("Brilliance") appeals from the district court's dismissal of its claims for copyright and trademark infringement under Fed. R. Civ. P. 12(b)(6). This case presents a question that has not been considered by this or any other court – whether the record rental exception to copyright's first sale doctrine, codified at 17 U.S.C. § 109(b)(1)(A), applies to all sound recordings, or only sound recordings of musical works. Specifically, this case asks whether the exception applies to sound recordings of literary

---

[*] The Honorable Bernice Bouie Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

works (known as "audiobooks" or "books on tape"). We find that it does not, and thus, the district court did not err in dismissing Brilliance's claims for copyright infringement. We disagree, however, with the district court's dismissal of Brilliance's claims for trademark infringement. Following the law of our sister circuits, we conclude that two exceptions exist to the first sale doctrine under trademark law and that Brilliance's complaint, construed broadly, has alleged that these exceptions apply in the present case. Thus, we affirm the decision of the district court in respect to the copyright claims but reverse in respect to the trademark claims.

## I.

In reviewing a dismissal under Rule 12(b)(6), we construe the complaint "in the light most favorable to the plaintiff" and thus draw all factual inferences in favor of Brilliance. *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 909 (6th Cir. 2003). Brilliance is in the business of producing and selling audiobooks. The company has a number of exclusive agreements with publishers and authors for the sound recording rights to their works. Brilliance has copyrights in these works and protectable rights in the federally-registered BRILLIANCE trademark. Brilliance produces two versions of its audiobooks: one for the retail sales market ("retail editions") and another specifically for libraries and lending institutions ("library editions"). The two editions are packaged and marketed differently, but it is unclear how, if at all, the underlying recordings differ between the two editions.

Defendants-appellees Haights Cross Communications, Inc., Haights Cross Communications, LLC, Haights Cross Operating Company, Recorded Books, LLC, and Audio Adventures LLC (collectively "Haights") are in direct competition with Brilliance. Brilliance alleges that Haights is repackaging and relabeling Brilliance's retail editions as library editions. According to Brilliance, Haights then markets the repackaged products as Brilliance's library editions and distributes them for commercial advantage by rental, lease, and lending. Brilliance has never authorized Haights to engage in this activity. Brilliance also claims that Haights uses the Brilliance mark on the repackaged products, which constitutes trademark infringement and results in the misrepresentation that Haights has a relationship with Brilliance and that its activities are authorized.

Brilliance brought a claim in federal district court alleging copyright infringement under 17 U.S.C. § 109. Brilliance also alleged trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), dilution under 15 U.S.C. § 1125(c), common law trademark infringement, and unfair competition (collectively the "trademark claims"). Haights moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The district court granted the motion to dismiss, and Brilliance filed this timely appeal.

We review the dismissal of a complaint on 12(b)(6) grounds *de novo*. *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 445 (6th Cir. 2000). The question is "whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Id.* at 446. The court should accept the plaintiff's factual allegations as true but "need not accept as true legal conclusions or unwarranted factual inferences." *Id.*

## II.

The district court found Brilliance's trademark complaints susceptible to dismissal under 12(b)(6) because the defense of first sale appeared on the face of the complaint. Construing the complaint broadly, and in the light most favorable to the plaintiff, we find this ruling to be in error.

It is true that trademark law contains a "first sale" exception that provides a defense to claims of infringement. *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368-69 (1924). Under the exception, resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition. *Id.* The rationale for the rule "is that trademark law is

designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987) (citing *Coty*, 264 U.S. at 368-69).

However, there are two situations in which resale of a product does not fall under the first sale exception. The first situation is when the notice that the item has been repackaged is inadequate. *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085-86 (9th Cir. 1998). The Ninth Circuit in *Enesco* looked to the Supreme Court's language in *Coty* in finding a requirement of adequate notice. *Id.* at 1086. The question in *Coty* was whether the defendant's repackaging of plaintiff's perfume and powder into smaller containers, which it then sold, constituted an infringement of the plaintiff's trademark. In finding that it was not, the Court stated:

> A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. . . . When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.
>
> * * *
>
> If the defendant's rebottling the plaintiff's perfume deteroriates it *and the public is adequately informed who does the bottling*, the public, with or without plaintiff's assistance, is likely to find out. And so of the powder in its new form.

*Coty*, 264 U.S. at 368-69 (emphasis added); *see also Enesco*, 146 F.3d at 1086 (quoting this language). We find this reasoning persuasive. When the public has adequate notice that the purchaser has repackaged the trademarked item, then the dangers of consumer confusion and trademark dilution are minimized. Absent this notice, the trademark holder risks being associated with a product that is not of the same quality as the original trademarked item. In order to properly protect trademark rights, this limit to the first sale doctrine is necessary.

The second situation in which the first sale doctrine does not apply is "when an alleged infringer sells trademarked goods that are *materially different* than those sold by the trademark owner." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001) (emphasis added). We join the many circuits that have adopted a similar rule. *See, e.g.*, *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 635 (1st Cir. 1992); *Original Appalachian Artworks v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302-03 (3d Cir. 1998); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1301-02 (5th Cir. 1997); *see also Abercrombie & Fitch v. Fashion Shops of Ky.*, 363 F. Supp. 2d 952, 963-65 (S.D. Ohio 2005) (adopting this rule). Like the requirement of adequate notice, the rationale behind the *Davidoff* exception is that a material difference in a product is likely to cause consumer confusion and could dilute the value of the trademark.

We note, though, that not all differences are material. *See Davidoff*, 263 F.3d at 1302. To be material, a difference must be "one that consumers consider relevant to a decision about whether to purchase a product." *Id.* But, "[b]ecause a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products." *Id.* The question of materiality is a fact-based inquiry requiring an examination of the products and markets at issue. *See id.* at 1303 (looking to the testimony of industry experts and findings that physical alterations of the good's container degraded the appearance of the product in finding a material alteration); *see also Nestle*, 982 F.2d at 641 (noting that materiality must be determined "on a case-by-case basis."). Thus, an allegation of a material difference cannot properly be dismissed on 12(b)(6) grounds.

Construing the complaint broadly, Brilliance has alleged that both of these exceptions to the first sale doctrine apply in the present case and thus that Haights has committed trademark infringement. The complaint claims that Haights is repackaging and relabeling Brilliance's retail editions as library editions and that the notice of repackaging is inadequate because it creates the misrepresentation that "[d]efendants have a long-standing relationship with Plaintiff and that the activities of Defendants are authorized and sponsored by Plaintiff." (Compl. ¶ 20-21.) The complaint also alleges that the inadequate packaging is likely to result in consumer confusion that will dilute the value of the trademark. *Id.* ¶ 39. In regards to whether the product is genuine, Brilliance alleges that the library edition is different from the retail edition. *Id.* ¶ 19. Brilliance claims that it packages and markets the two editions differently and that by repackaging retail editions as library editions, Haights is altering the product in a manner likely to cause consumer confusion. *Id.* ¶¶ 19, 20, 24. Brilliance claims that this confusion will diminish the value of its trademark. *Id.* ¶ 39. Although the complaint does not specifically use the word "material" in describing the product difference and leaves some ambiguity in allegations as to whether the product is in fact different or only the packaging and marketing, we cannot conclude that plaintiff has alleged insufficient facts to permit granting relief. Thus, the district court erred in dismissing the trademark claims under Rule 12(b)(6).

### III.

### A.

The district court also dismissed Brilliance's claim that Haights infringed its copyright by renting its audiobooks without permission. Like trademark law, the default rule in copyright is the "first sale doctrine" – the copyright holder controls the right to the underlying work, but the owner of a particular copy can dispose of it in any manner he or she wishes. 17 U.S.C. § 109(a). Congress has passed a limited exception to the first sale doctrine – the Record Rental Amendment of 1984.

> Notwithstanding the provisions of subsection (a), unless authorized by the owners of a copyright in the sound recording[,] . . . and . . . in the musical works embodied therein, [] the owner of a particular phonorecord . . . may [not], for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord . . . by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending.

*Id.* § 109(b)(1)(A). Brilliance argues that this exception to the first sale doctrine applies to sound recordings of literary works. Haights counters that the statute applies only to sound recordings of musical works, and thus, audiobooks are governed by the default first-sale rule.

To settle this dispute, we must try to determine Congress's intended meaning in subsections (a) and (b) of § 109. As with any question of statutory interpretation, we must first look to the language of the statute itself. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)); *Cox v. Mayer*, 332 F.3d 422, 424 (6th Cir. 2003). If the language of the statute is clear, then the inquiry is complete, and the court should look no further. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 n.29 (1978); *see also Desert Palace*, 539 U.S. at 98. Only if the statute is "inescapably ambiguous" should a court look to other persuasive authority in an attempt to discern legislative meaning. *Garcia v. United States*, 469 U.S. 70, 76 n.3 (1984) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395-96 (1951) (Jackson, J., concurring)). Persuasive authority can include other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed.

Both Brilliance and Haights argue that the plain language of § 109(b)(1)(A) unambiguously supports their respective positions. The district court agreed with Haights that the express inclusion

of "musical works" in the statute means that the statute applies only when a sound recording has "musical works embodied therein." Extending the exception to audiobooks would read the "musical works" clause out of the statute, and thus, by its own terms, the statute applies only to sound recordings that contain musical works. Brilliance counters that the exception is not limited to recordings of musical works. The plain language of the statute requires obtaining the permission of the owner of the copyright in the sound recording regardless of whether the second permission – that of the copyright owner in the underlying work – is needed. For a musical recording, the second permission is necessary; for a recording of a literary work, it is not. But this does not change the fact that the statute explicitly applies to all "sound recordings," a term defined elsewhere in the Copyright Act to include both musical and non-musical works. 17 U.S.C. § 101.

As both parties have laid out plausible readings of the statutory language, we find that the language of § 109(b)(1)(A) is not unambiguous. One reading requires only the consent of the copyright owner in sound recordings containing musical works, as well as consent from the copyright owner in those musical works. The statute may also be read, however, to mandate obtaining permission from the copyright owners of all sound recordings and additionally to require the consent of the copyright owner in the work being recorded, if it is a musical work. Thus, the meaning of the statute cannot be determined merely by reference to the statutory text. To resolve the ambiguity, we must turn to the legislative history and policy rationales behind the § 109(b)(1)(A) exception.

B.

Although none standing alone gives definitive proof as to the statute's meaning, the combination of the legislative history, the context in which the statute was passed, and the policy rationales behind both § 109 and copyright law in general provide strong evidence that Congress intended to exclude only sound recordings of musical works from the first sale doctrine.

At the time Congress adopted the exception in 1984, the exclusive focus of the testimony and the legislators was on protecting the music industry. The Senate Report accompanying the bill explicitly references the need to "remove the threat that commercial record rentals pose to the health of America's musical community." S. Rep. 98-162, at 2 (1984). The Report focuses on the danger record rentals pose to "musical creativity" and the willingness of "record companies and music publishers" to take risks on "unknown artists and songwriters" or "to experiment with innovative musical forms." *Id.* at 3. Thus, the Report concludes, "modification of the first sale doctrine . . . [is] appropriate in light of the unique problems presented by record rental and copying." *Id.* at 5. Similarly, the House Report summarizes testimony from numerous music industry officials in concluding that the threat of record rental and home taping could have an adverse impact on the affected copyright owners. H.R. Rep. No. 98-987, at 2-3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 2898, 2899-2900. The House Report did state that "sound recording" was to have the same meaning as in § 101, which includes both musical and non-musical works, but this was intended to clarify that § 109(b) did not apply to motion pictures, which were specifically excluded, or to computer programs. *Id.* at 4; *see also* S. Rep. 98-162, at 6. There is no evidence that Congress ever considered audio recordings of literary works when drafting the § 109(b) exemption. When Congress extended the exception in 1988, however, at least one committee report made clear that recordings of literary works were not covered by § 109(b).

> While the definition of "sound recording" in 17 U.S.C. 101 appears to include the three categories at issue, the Register correctly noted that "the context of the legislation clearly establishes that only musical works were considered susceptible to extensive home taping." The legislative history of the enactment of the law in 1984 reveals that the specific problem addressed then was that consumers listen repeatedly to musical works, thus giving rise to the legitimate concern about displacement of sales.

* * *

> It is less likely, on the other hand, that literary works invite the same kind of long-term, repeated enjoyment by consumers. The problems addressed by the Act in 1984 do not relate to recorded literary works, nor did the testimony in support of the legislation. In addition, during the 1988 hearings, no specific problems regarding the rental of recorded literary works were raised.

H.R. Rep. No. 100-776, at 3 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4339, 4341.

The fact that Congress intended to address concerns with musical recordings, as opposed to non-musical recordings, is not necessarily dispositive. After all, a statute can be written so as to cover not only present concerns, but also future concerns that Congress cannot foresee at the time of enactment. Legislators cannot be expected to predict and account for all technological advances and other problems not apparent when a bill is enacted.

The statute at issue in this case, however, should be construed narrowly because it upsets the traditional bargain between the rights of copyright owners and the personal property rights of an individual who owns a particular copy. This bargain, first developed in the common law, *see Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908), and later codified in the first sale doctrine, 17 U.S.C. § 109(a), provides that once a copyright owner consents to release a copy of a work to an individual (by sale, gift, or otherwise), the copyright owner relinquishes all rights to that particular copy.[1] The limited monopoly created by copyright law is needed to promote the creation of new works and ensure that the creator is properly compensated for this effort. Once a copyright holder has consented to distribution of a copy of that work, this monopoly is no longer needed because the owner has received the desired compensation for that copy. *See Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1389 (C.D. Cal. 1993) ("[T]he distribution right and the first sale doctrine rest on the principle that the copyright owner is entitled to realize no more and no less than the full value of each copy or phonorecord upon its disposition."). The first sale doctrine ensures that the copyright monopoly does not intrude on the personal property rights of the individual owner, given that the law generally disfavors restraints of trade and restraints on alienation. *See Sebastian Int'l, Inc. v. Consumer Contacts (PTY Ltd.)*, 847 F.2d 1093, 1096 (3d Cir. 1988) ("The first sale rule is statutory, but finds its origins in the common law aversion to limiting the alienation of personal property."); H.R. Rep. 98-987, at 2 ("The first sale doctrine has its roots in the English common law against restraints on alienation of property."); *see also* Melville B. Nimmer & David Nimmer, 2 *Nimmer on Copyright*, § 8.12[A] (2006). In passing the record rental exception, Congress made a specific policy choice that personal property rights in a certain type of work – sound recordings of musical works – should give way to ensure that copyright owners receive the protections envisioned by the Copyright Act as a whole.

By doing this, Congress effectively altered the traditional copyright bargain and extended the copyright monopoly for a limited set of works. In order to protect the bargain between copyright owners and personal property owners, we will not construe this exemption from the first sale doctrine any more broadly than explicitly mandated by Congress. The specific problem addressed by Congress in 1984 – rampant piracy of popular musical recordings – does not apply to sound recordings of literary works. When evidence surfaced of a new class of works in need of § 109(b) protection – computer software – Congress amended the statute to explicitly exempt the works from

---

[1] The legislative history provides additional support for this reading of the first sale doctrine. *See* H.R. Rep. 94-1476, at 79 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5693 ("Section 109(a) restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means. [T]his principle . . . has been established by the court decisions and section 27 of the present law . . . .").

the first sale doctrine.  *See* Pub. L. No. 101-650, § 802, 104 Stat. 5089, 5134-35 (1990).  Absent such an express statement from Congress regarding audiobooks, there is no evidence that Congress intended to alter the copyright bargain, and we see no reason to extend § 109(b) beyond its original context.

Thus, § 109(b)(1)(A) is best read as providing only a limited exception to the first-sale doctrine for sound recordings of musical works.  When considered with the legislative history and the policy rationales underlying the Copyright Act, Congress's use of the phrase "and in the musical works embodied therein" limits the statute's application to only those sound recordings that contain musical works.  The language of the statute does not unambiguously apply to audiobooks, and we have found no evidence that it should be so construed.  We hold that § 109(b)(1)(A) applies only to sound recordings of musical works and does not apply to sound recordings of literary works.

IV.

For the foregoing reasons, we reverse the district court's dismissal of the trademark claims and affirm the dismissal of the copyright claims.  We remand the case for proceedings consistent with this opinion.

---

## CONCURRING IN PART, DISSENTING IN PART

---

KENNEDY, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the activities alleged would constitute trademark infringement, and thus we should deny the 12(b)(6) motion as it pertains to the trademark claims. However, my reading of the statute corresponding to the copyright claim differs and leads me to conclude that the activities alleged would also give rise to an actionable copyright violation, and thus this claim should also survive the motion to dismiss.

As § 109(a) provides for the legal sale of particular copies of phonorecords, § 109(b) appears only to prohibit the unauthorized rental, lease, or lending of such materials. I interpret the clause "in the case of a sound recording in the musical works embodied therein" to mean that, if a sound recording containing musical works is the object of the rental, lease, or lending, then the person engaging in such activities can only lawfully do so with the authorization of the owner of the copyright for the sound recording and the owner of the copyright for the musical works contained in the sound recording. Because there is no musical recording contained in the sound recording at issue here, this clause does not apply to this case. Since I do not read this provision pertaining to musical works to qualify the application of § 109(b) as a whole, I would find that the plaintiffs in this case have raised a claim of copyright violation, as the activities alleged, if true, would constitute rental, lease, or lending of a sound recording for commercial advantage without the authorization of the owner.

The majority's analysis leads me to emphasize that, because I find that the language of the statute is not "inescapably ambiguous," I do not feel it is necessary to examine the legislative history of § 109(b). *See Garcia*, 469 U.S. at 76 n.3. In 2005, the Supreme Court reflected upon its statutory interpretation jurisprudence, declaring, "[a]s we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs.* 125 S. Ct. 2611, 2626 (2005). The Court went on to cite "two serious criticisms" to which "legislative history in particular is vulnerable":

> First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in "'looking over a crowd and picking out your friends." Second, judicial reliance on legislative materials . . . may give unrepresentative committee members–or, worse yet, unelected staffers and lobbyists–both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

*Id.* (citations omitted). Such dangers counsel against imputing the sentiments expressed in extrinsic materials as well as the original impetus for the passage of the statute to the meaning of its enacted form. Because I feel § 109(b) does not necessitate resort to legislative history to determine the section's effect on petitioner's copyright claim, and public policy generally counsels against this interpretive method, I would have this court deny the 12(b)(6) motion as it pertains to the copyright violation based upon a plain-language reading of § 109(b).