ABERCROMBIE & FITCH,
et al Plaintiffs,

v.

FASHION SHOPS OF KENTUCKY,
INC., et al Defendants.

No. 1:05CV29.

United States District Court,
S.D. Ohio.

Feb. 16, 2005.

Eric Wade Richardson, Daniel Jerome Buckley, Vorys Sater Seymour & Pease, Cincinnati, OH, John L. Landolfi, Vorys Sater Seymour & Pease, Columbus, OH, William H. Oldach, III, Vorys Sater Seymour & Pease LLP, Washington, DC, for Plaintiffs.

James David Liles, King & Shickli, PLLC, Lexington, KY, for Defendants.

## MEMORANDUM OPINION & ORDER

WATSON, District Judge.

This matter is before the Court upon Plaintiffs' Motion for Preliminary Injunction. (Doc. 3) Defendant filed a Memorandum in Opposition (Doc. 8) and Plaintiffs filed a Reply. (Doc. 12) Defendant was also granted leave to file a Sur-reply. (Doc. 16) On January 28, 2005, the Court held a hearing on the application for a preliminary injunction in accordance with Fed.R.Civ.P. 65(a)(2). For the reasons

stated herein, the Court orders that the Motion be **GRANTED**.

## I. FACTUAL BACKGROUND

Plaintiffs (hereafter referred to collectively as "Abercrombie") are a national retailer of casual apparel targeted at men and women aged eighteen through college.[1] Abercrombie maintains that it enjoys an excellent reputation through its high-quality merchandise, highly successful marketing efforts, and its 110–year history in the retail field. Abercrombie explains that it uses a number of registered and common law trademarks in the marketing and sale of its goods, but the most relevant registered marks for purposes of this action are: No. 951,410 for the mark "ABERCROMBIE & FITCH;" No. 2,530,-664 for the mark "A & F;" and No. 2,774,-426 for the mark "HOLLISTER CO." (Plaintiffs' Preliminary Injunction Hearing Ex. 1, 2, 3)[2]

Defendant Fashion Shops of Kentucky, Inc. (hereinafter referred to collectively as "Fashion Shop")[3] operates a small, family-owned, off-price retail clothing chain. Fashion Shop stores are located in Kentucky, Indiana, and Ohio. Fashion Shop sells brand-name clothing, typically quantity overproduction or end-of-season goods, at discount prices. Fashion Shop states that it has sold Abercrombie-branded merchandise for the past ten years.

Abercrombie seeks to enjoin Fashion Shop from selling any articles of clothing bearing the marks "ABERCROMBIE & FITCH," "A & F," "HOLLISTER CO.," or "HOLLISTER;" or using these marks in any advertising or promotional material.

Abercrombie is also seeking an order from this Court requiring Fashion Shop to turn over to Abercrombie any and all articles of clothing in its possession bearing the marks "ABERCROMBIE & FITCH," "A & F," "HOLLISTER CO.," or "HOLLISTER." In addition, Abercrombie is seeking Fashion Shop's business records demonstrating the quantity, type, purchase price and sales price for all articles of clothing bearing the marks "ABERCROMBIE & FITCH," "A & F," "HOLLISTER CO.," or "HOLLISTER" which Fashion Shop has had in its possession since January 1, 2000, as well as records identifying all entities or individuals from whom Fashion Shop has acquired this merchandise.

At the hearing, Matt Braun, an Abercrombie Brand Protection Specialist, testified that in September of 2004 he learned that Fashion Shop was selling Abercrombie merchandise in one of its stores in Louisville, Kentucky. This information came from a security supervisor who had been working in the area for two months. In October of 2004, Braun visited this store and two other Louisville stores, inspected the Abercrombie merchandise, and determined that approximately fifty percent of the merchandise was counterfeit. Braun based his determination on certain clues: the clothing was black, but Abercrombie does not produce black clothing; the labels on the printed t-shirts stated that they were made in Turkey, but Abercrombie does not produce t-shirts in Turkey; the sweatpants had a "1892" graphic imprint, but Abercrombie has not approved that style or font of the "1892" graphic; and the clothing was an inferior

---

1. Plaintiffs A & F Trademark, Inc. and J.M.H. Trademark, Inc. are the record owners of the trademarks at issue in this case.

2. For purposes of the hearing, the parties stipulated that Defendants are the owners of these marks.

3. The parties are in agreement that although the Complaint names two parties—Fashion Shops of Kentucky, Inc. and Fashion Shops of America, Inc.—the proper party is Fashion Shops of Kentucky, Inc. (Doc. 12, at 2 n. 1)

quality to that produced by Abercrombie. Examples of genuine and counterfeit Abercrombie clothing were marked as Plaintiffs' Exhibits 6 through 16 at the hearing.

Braun telephoned Fashion Shop and Informed them that he determined that the stores were selling counterfeit merchandise. David Levine, the owner of Fashion Shop, met Braun at the one of the Louisville stores. Levine had all items which Braun indicated were counterfeit removed from the store's display area. Levine also directed the other Fashion Shop stores to remove like items from display. In addition, at Braun's direction, Levine removed the signs which advertised Abercrombie merchandise. (Plaintiffs' Ex. 17) Braun told Levine that the remaining Abercrombie merchandise "appeared to be genuine." This merchandise remained on display. Braun testified that Abercrombie is still in the process of investigating whether or not this merchandise is counterfeit.

While they were at the store, Braun handed Levine two letters which directed Fashion Shop to "immediately cease and desist from any and all further use of any and all of the ABERCROMBIE & FITCH trademarks;" and to provide information regarding Fashion Shop's sales, inventory, and suppliers of Abercrombie merchandise. (Plaintiffs' Ex. 18)

At the hearing, Benjamin Levine, Vice President of Fashion Shop, testified that Fashion Shop has no interest in selling counterfeit merchandise such as those illustrated by Plaintiffs' Exhibits 6 through 16. Levine stated that Fashion Shop will remove any items which Abercrombie reasonably identifies as counterfeit from their stores.[4]

John Carriero, Abercrombie's Director of Loss Prevention, explained at the hearing that Abercrombie's merchandise is produced by various overseas manufacturers. Carriero stated that after production, all merchandise is inspected at Abercrombie's distribution center in New Albany, Ohio. Carriero stated that the merchandise which passes inspection is only sold in Abercrombie stores. Carriero explained that merchandise is rejected if it does not meet Abercrombie's high quality standards. Carriero stated that a merchandise order may be cancelled if the quality of a "sample run" of the merchandise shipped to Abercrombie does not meet its standards; or the order is going to be delivered late.

Carriero explained that Abercrombie allows the manufacturers to sell any rejected merchandise, but with certain restrictions. These restrictions are memorialized in a "Sell–Off Compliance Agreement." (Plaintiffs' Ex. 19) As stated in the Agreement, no Abercrombie merchandise can be sold in the United States, and Abercrombie must approve of the final destination for the merchandise. (*Id.*) In addition, Abercrombie requires that certain modifications be made: the brand names on all interior labels must be "blacklined" or "cut" through prior to being sold; all marketing that contains brand names (such as price tickets and hangtags) must be removed; and interior prints and tapes which contain the brand names must be marked through completely with black indelible ink. (*Id.*) Carriero explained that Abercrombie keeps a record of all merchandise which was authorized for "sell off" each year. (Plaintiffs' Ex. 22)

Carriero testified that there were two exceptions to Abercrombie's prohibition against merchandise being sold within the United States. First, Carriero explained that Abercrombie permitted manufacturers to sell denim garments within the

---

4. Braun testified that counterfeit clothing was found in Defendants' Cincinnati, Ohio stores on January 6, 2005. However, Defendants seemed to indicate that this was an oversight.

United States because Abercrombie's demanding quality standards resulted in a high number of rejected garments, and the overseas market for such denim garments was not good. Second, Carriero explained that Abercrombie permitted a chain of discount stores called "Gabriel Brothers" to sell any end-of-season merchandise which did not sell at their outlet stores and any damaged merchandise which came from the Abercrombie retail stores. Carriero testified that none of the merchandise approved for sale by Gabriel Brothers had "ever" surfaced in other retail outlets in the United States.

Carriero stated that Abercrombie employs Investigators world-wide to ensure that their manufacturers are not "selling off" or manufacturing merchandise without their approval. Carriero also explained that it would not be in a manufacturer's best financial interest to "cross" Abercrombie. However, Carriero admitted that it was impossible to police all the sales of the rejected merchandise. Carriero testified that while some of the labels on the clothing were marked with a black or red line, these markings were not done according to Abercrombie's requirements under the "Sell–Off Agreement." [5]

Levine testified that Fashion Shop purchased Abercrombie merchandise and other merchandise from various "jobbers." Levine explained that this merchandise was often made available at different trade shows throughout the United States. Levine testified that Fashion Shop was never told that it needed authorization to sell Abercrombie products, but he also stated that Fashion Shop has never sought such authorization. Levine testified that Fashion Shop's purchasers do not typically question how the jobbers acquired the merchandise.

Levine testified that he was informed by one of Fashion Shop's employees that a customer had been sent to Fashion Shop's store by an Abercrombie store employee to purchase Abercrombie shorts from the previous season.

Levine testified that if the Court were to order Fashion Shop to stop selling Abercrombie merchandise, it would threaten their line of credit, and possibly result in Fashion Shop declaring bankruptcy. Levine estimated that the Abercrombie merchandise comprised of $150,000 worth of inventory. Levine stated that the loss of this inventory would lower the quality of the merchandise in their stores and interfere with the planning done for the season. Levine estimated the overall financial impact on Fashion Shop to be $300,000, which would be "potentially catastrophic."

## II. ARGUMENTS OF THE PARTIES

### A. *Plaintiffs.*

Abercrombie's argument centers on the definition of "genuine." At the hearing, Abercrombie maintained that merchandise which Abercrombie has not approved for sale, is "non-genuine." In its motion, Abercrombie relies on *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392 (2d Cir.1986) for the proposition that a trademark signifies that the trademark owner is controlling the nature and quality of the goods sold under the mark, and therefore, when the owner is deprived of its right to exercise quality control, there is trademark infringement.

### B. *Defendants.*

Fashion Shop states that there is no dispute regarding any counterfeit merchandise, and does not claim any right to

---

**5.** These requirements were illustrated in a document which was presented at the hearing, but was not entered as an exhibit.

sell such merchandise. However, Fashion Shop accuses Abercrombie of attempting to extend its trademark rights beyond their legitimate limits by prohibiting Fashion Shop from selling genuine merchandise. Fashion Shop defines "genuine" to include merchandise manufactured by an Abercrombie supplier. Fashion Shop maintains that under Sixth Circuit precedent, it is permissible to sell this merchandise without the authorization of the trademark owner.

## III. ANALYSIS

### A. *The Lanham Act.*

Abercrombie alleges violations under two sections of the Lanham Act: (1) trademark infringement and counterfeiting under 15 U.S.C. § 1114 and (2) unfair competition under 15 U.S.C. § 1125(a).[6]

■ To establish liability for trademark infringement under section 1114, the trademark registrant must show: (1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion. *Too, Inc. v. TJX Companies, Inc.*, 229 F.Supp.2d 825, 829 (S.D.Ohio 2002), *citing, Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1086–88 (D.Md.1995). The registrant does not need to prove intent under this section. *Id., citing, Procter & Gamble Co. v. Quality King Distributors, Inc.*, 123 F.Supp.2d 108, 112 (E.D.N.Y.2000).

■ To establish liability for trademark counterfeiting under section 1114, a plaintiff must allege that: (1) the defendant infringed a registered trademark in violation of section 1114; and (2) the defendant intentionally used the mark knowing it was a counterfeit, as the term counterfeit is defined in 15 U.S.C. § 1116. *Id.* at 837, *citing, Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1180 (11th Cir.

---

**6.** Under 15 U.S.C. § 1114:

(1) Any person who shall, without the consent of the registrant-

(a) use In commerce any reproduction, counterfeit, copy, or colorable Imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

Under 15 U.S.C. § 1125(a):

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

1994). Therefore, a claim for trademark counterfeiting involves a higher burden of proof because a plaintiff must show both trademark infringement and the intentional use of a counterfeit mark. *Id.*

A claim for unfair competition under section 1125(a) does not require a plaintiff to prove that the defendant used the plaintiff's trademark. *U–Haul Int'l, Inc. v. Kresch*, 904 F.Supp. 595, 602 (E.D.Mich.1995). Instead, section 1125(a) was intended to reach other aspects of unfair competition, such as infringement of unregistered marks and false advertising. *Shonac v. AMKO Int'l, Inc.*, 763 F.Supp. 919, 925, 927 (S.D.Ohio 1991).

Abercrombie is proceeding on the theories that Fashion Shop is selling Abercrombie merchandise that is either counterfeit or not authorized for sale by Abercrombie. Abercrombie argues that either type of merchandise are "non-genuine," and therefore this Court's determination regarding the requested injunctive relief is dependant upon the definition of "genuine" in the context of trademark protection.

Based on the testimony at the hearing, there are possibly six categories of merchandise at issue. The first is counterfeit merchandise. A large part of the testimony at the hearing related to how Abercrombie was able to determine whether certain merchandise being sold by Fashion Shop was counterfeit. However, Fashion Shop does not dispute any of the counterfeit designations made by Abercrombie. The second category is merchandise that Abercrombie has rejected based on its quality standards, but has approved for sales overseas under the terms of a "Sell–Off Compliance Agreement." The third category is merchandise Abercrombie has rejected based on late production but approved for sales overseas under the terms of a "Sell–Off Compliance Agreement." The fourth category is merchandise which has been approved for sale in the United States, but is limited to denim products. The fifth category is merchandise approved for sale in the Gabriel Brothers stores, namely the end-of-season and damaged merchandise from Abercrombie stores and outlets. The final category of merchandise consists of merchandise sold by Abercrombie's manufacturers without Abercrombie's approval. For example, an Abercrombie manufacturer could have produced a greater number of items than Abercrombie ordered, shipped only the number ordered to Abercrombie, and then sold the excess merchandise. It is also possible that Abercrombie manufacturers have sold rejected merchandise without a "Sell–Off Compliance Agreement." However, to be clear, the parties do not know the manufacturing source of any of the merchandise found in the Fashion Shop stores.

## B. *Preliminary Injunction Standard.*

When ruling on a motion for a preliminary injunction, this Court must consider and balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003), *citing, Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998). These four considerations are factors to be balanced, not prerequisites that must be met. *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985), *citing, In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985).

As this Court has previously recognized, under the Lanham Act, "a movant may merit preliminary injunctive relief simply upon a showing of irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1428 (S.D.Ohio 1990) (Kinneary, J.), *quoting, Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 651 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

1. *Likelihood of Success on the Merits.*

The touchstone of both a trademark claim under section 1114 and an unfair competition claim under section 1125 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir.1996) (the same factors are considered under section 1125(a) as are considered under section 1114).

 In determining whether a "likelihood of confusion" exists, this Court must consider eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8)

likelihood of expansion of the product lines. *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982).

These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249–50 (6th Cir.2003), *quoting, Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores*, 109 F.3d at 280.

Rather than focusing on the specific "likelihood of confusion" factors, the parties have instead centered their arguments around whether or not the Abercrombie merchandise being sold by Fashion Shop is "genuine." This approach is understandable given that many courts, including this Court, have treated genuiness as a threshold question. *See e.g., Too, Inc.*, 229 F.Supp.2d at 829.[7]

Abercrombie would have this Court adopt the genuineness analysis used by the Second Circuit in *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). This case has been cited often by this Court and other district courts within the Sixth Circuit: *Too, Inc. v. TJX Companies, Inc.*, 229 F.Supp.2d 825, 832 (S.D.Ohio 2002); *Ford Motor Co. v. Lloyd Design Corp.*, 184 F.Supp.2d 665, 676

7. As one district court has explained, this approach has grown out of the "oft-repeated maxim" that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *John Paul Mitchell Systems v. Pete–N–Larry's Inc.*, 862 F.Supp. 1020, 1023 (W.D.N.Y.1994). It should be noted that the court was somewhat critical of this approach, and was of the belief that it had created "a certain quantum of semantic confusion." *Id.*

(E.D.Mich.2002); *U–Haul Intern., Inc. v. Kresch,* 904 F.Supp. 595, 599 (E.D.Mich. 1995); *Little Caesar Enterprises, Inc. v. R–J–L Foods, Inc.,* 796 F.Supp. 1026, 1035 (E.D.Mich.1992); *Advanced Sports Concepts, Inc. v. Baden Sports, Inc.,* No. 93–100, 1993 WL 592529, *3 (S.D. Ohio June 7, 1993); *Shonac Corp. v. AMKO Intern., Inc.,* 763 F.Supp. 919, 937 (S.D.Ohio 1991).

The facts of *El Greco* are as follows: the plaintiff contracted with a Brazilian shoe company to manufacture shoes bearing the plaintiff's trademark. 806 F.2d at 393. The manufacturer was to ship the shoes, in seven lots, no later than June 15, 1983. *Id.* The plaintiff's agent in Brazil was to inspect the shoes before shipment to assure that they met the plaintiff's specifications and quality standards. *Id.* Payment would not be made without a certificate of inspection. *Id.* Either due to inferior quality or production delays, the plaintiff cancelled its order for the last two lots and transferred those orders to another factory.[8] *Id.* at 394. Nevertheless, the shoes were still manufactured, and the plaintiff did not specifically instruct the manufacturer on how to dispose of the shoes. *Id.* The manufacturer sold the shoes, through an intermediary, to the defendant, who then sold the shoes in its retail stores. *Id.* When the plaintiff discovered that the defendant was selling the current style of their shoes, it brought claims under sections 1114 and 1125(a) of the Lanham Act. *Id.*

The district court dismissed the plaintiff's complaint for a preliminary injunction, finding that the shoes in question were genuine, and their sale, even though it was not authorized by the plaintiff, could not constitute a violation of the Lanham Act. *Id.*

The court of appeals began its analysis by stating that "the heart of this case is whether the shoes at issue were 'genuine' for purposes of the Lanham Act." *Id.* at 395. The court noted the defendant's position that the sale of genuine goods cannot give rise to the necessary likelihood of confusion.[9] *Id.* However, the court stated that even so, the shoes sold by the defendant could not be considered genuine. *Id.* The court explained:

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. *Menendez v. Faber,* 345 F.Supp. 527 (S.D.N.Y.1972), *aff'd in relevant part and modified,* 485 F.2d 1355 (2d Cir.1973), *modification rev'd sub nom. Alfred Dunhill, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain. *Professional Golfers Association of America v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670–71 (5th Cir.1975).

*Id.* The court stated that a trademark holder is entitled to require that no merchandise be distributed without first being inspected to insure quality. *Id.* The court noted that the plaintiff had not waived the right to such an inspection, and even required the inspection certificate as a condition of payment. *Id.* The court found that the certificates of inspection were an inte-

---

8. The court explained that the official reason the plaintiff gave was production delays, but it was unclear whether these delays were, in turn, caused by quality control problems. 806 F.2d at 394.

9. The defendant had cited *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.,* 707 F.2d 1054 (9th Cir.1983), and *DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 622 n. 1 (2d Cir.1980).

gral part of the plaintiff's effort at quality control. *Id.*

The court criticized the lower court's definition of "genuine" as being too narrow. *Id.* The court stated that "the mere act of ordering a product to be labeled with a trademark does not deprive its holder of the right to control the product and the trademark." *Id.* at 395–96. The court also stated that it was not necessary for the plaintiff to instruct the manufacturer on how to dispose of the shoes. *Id.* The court concluded that even though the defendant was not involved in the manufacture of the shoes, or the affixing of the trademark to the shoes, its sale of the shoes was sufficient "use" under the Lanham Act for it to be liable for infringement. *Id.* at 396. The court also held that the defendant's claimed lack of knowledge of its supplier's infringement was no defense. *Id.*[10]

One commentator has noted that subsequent to its decision in *El Greco,* the Second Circuit has emphasized that the *El Greco* rule does not change the basic rule that "the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation." 4 McCarthy on Trademarks and Unfair Competition § 25:42 (4th ed.), *citing, H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1023 (2d Cir.1989). As the commentator explained:

> The courts have struggled with drawing the line between two situations, one legal, the other an infringement. The legal situation is a distributor's resale of unchanged trademarked goods under the "first sale" or "exhaustion" rule, free from the control of the brand owner. The infringing situation is where the trademark owner is entitled to exercise control over the distribution, handling and sale of the trademarked product, such that sale of trademarked products without such quality control is an infringement.

*Id.* This struggle to draw the line is certainly evident in decisions of this Court. *See, e.g., Too, Inc. v. TJX Companies, Inc.,* 229 F.Supp.2d 825, 834 (S.D.Ohio 2002) (Sargus, J.) (holding that there is a substantial likelihood that the garments were not authorized for production, and therefore there is a likelihood that the garments cannot be considered genuine); *Shonac Corp. v. AMKO, Int'l, Inc.,* 763 F.Supp. 919, 937 (S.D.Ohio 1991) (Graham, J.) (citing *El Greco* but concluding that it was inapplicable because plaintiff lacked standing); *Advanced Sports Concepts, Inc. v. Baden Sports, Inc.,* No. 93–100, 1993 WL 592529, *3 (S.D. Ohio June 7, 1993) (Graham, J.) (holding basketballs were genuine because there was no evidence that they failed to conform with plaintiff's manufacturing contract specifications, and therefore *El Greco* did not apply).

The Court of Appeals for the Sixth Circuit has not considered the *El Greco* decision. However, it appears that the court does recognize the "first sale" or "exhaustion" doctrine as a defense. In *PACCAR Inc. v. TeleScan Technologies, L.L.C.,* the court explained that the first sale doctrine applies when a purchaser "does no more than stock, display, and resell a producer's product under the producer's trademark." 319 F.3d at 257, *citing, Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1076 (9th Cir.1995). Nevertheless, the court explained that the first sale doctrine offers no defense when "the reseller used the trademark in a manner likely to

---

**10.** The court stated that the defendant made no inquiry and had no reason to believe that the plaintiff had approved of the use of its mark. 806 F.2d at 396. The court stated that the defendant could have "easily ascertained whether the shoes in question were genuine." *Id.*

cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees." *Id.*

However, as Judge Sargus of this Court has recognized, the exhaustion or first sale doctrine "presupposes that the goods were authorized to be made, in the first instance." *Too, Inc. v. TJX Companies, Inc.*, 229 F.Supp.2d at 834, *citing, Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224, 230 (S.D.N.Y.1997). Accordingly, Judge Sargus held that where the plaintiff comes forward with evidence showing "a substantial likelihood that the garments were not authorized for production in the first place ... there is a likelihood that the garments cannot be considered genuine for purposes of the Lanham Act." *Id. See also McDonald's Corp. v. Shop at Home, Inc.*, 82 F.Supp.2d 801, 811 (M.D.Tenn.2000) ("It does not matter that the owner of the trademark objects to the use of its mark, as long as one approved sale has already occurred.").

■ At this juncture, it is possible to "draw the line" between several legal and infringing situations in this case. The most easily recognized is the merchandise identified as being counterfeit. Fashion Shop does not contend that these items are "genuine," and consequently has agreed to not sell any counterfeit merchandise. Second, the denim products which Abercrombie approves for sale in the United States can be considered "genuine" under the first sale doctrine. Accordingly, Abercrombie stated in its motion that the denim articles were "not relevant to this action." [11] Presumably, they do not seek to enjoin Fashion Shop from selling any denim items which are not counterfeit. The first sale doctrine would also apply to merchandise which Abercrombie has approved for sale in Gabriel Brothers' stores. However, it was Carriero's testimony that this merchandise has never made its way to another store, and Fashion Shop has not presented any evidence to contradict this statement.

■ Another easy "line" to draw is that demarcating any merchandise manufactured without Abercrombie's approval or rejected by Abercrombie and sold without a "Sell–Off Compliance Agreement." Under the first sale doctrine, this merchandise was not "authorized to be made, in the first instance," nor has an approved sale of this merchandise occurred. Understandably, Fashion Shop has not argued that this is the source of the merchandise in their stores. However, this remains as one possible source of the Abercrombie merchandise which has been found in the Fashion Shop stores.

Abercrombie argues, correctly, that this category of merchandise falls squarely within the *El Greco* rule and this Court's decision in *Too, Inc. v. TJX Companies, Inc.*

In *Too, Inc.*, the plaintiffs were seeking to enjoin the defendant from selling allegedly counterfeit or unauthorized clothing.[12] 229 F.Supp.2d at 827. There was evidence that the plaintiff had a practice of selling prior season merchandise to off-price retailers, including the defendant. *Id.* However, the styles the defendant was selling

---

**11.** At the hearing, Fashion Shop did introduce a pair of jeans from their stores and a pair of jeans purchased from an Abercrombie store. (Defendant's Ex. 4 and 5) However, Abercrombie maintains that this article of clothing is counterfeit.

**12.** Judge Sargus explained his use of the term "unauthorized" as follows: "As used in the parlance of trademark law and, as discussed *infra*, 'unauthorized' goods are those which were produced by a manufacturer otherwise authorized by the holder to make trademarked products, but a quantity of such products were made without authorization as to amounts or quality. An example would be an unauthorized sale of excess quantities by the manufacturer." 229 F.Supp.2d at 827 n. 4.

were the same styles being sold in the plaintiff's stores. *Id.* at 827–28. Just as in this case, the parties did not offer any evidence as to the identity of the manufacturer of the clothing. *Id.* at 829. Judge Sargus found that there were two possible sources of the clothing: companies with whom the plaintiffs had contracted to produce marked clothing had produced items in excess of the plaintiffs' orders and then sold these items; or companies who counterfeited the clothing through reverse engineering. *Id.* Based on the evidence presented, Judge Sargus determined the clothing came from both sources. Judge Sargus explained that the evidence demonstrated that the defendant possessed a greater number of garments than the plaintiffs authorized for production. *Id.* at 830. For example, the plaintiff had ordered 11,389 units of one style, and received 11,779 units. *Id.* The plaintiff sold 10,464 units and made 764 adjustments. *Id.* However, the defendant possessed 15,200 of that same style garment. *Id.* In addition, the number of units possessed by the defendant far exceeded the number of units left in the plaintiffs' possession following sales in the plaintiffs' stores. *Id.* There were also discrepancies in the garments themselves which demonstrated that the items were either unauthorized or counterfeit. *Id.* Judge Sargus found that this evidence was unrefuted, and demonstrated a substantial likelihood that the garments were made without the plaintiff's authorization. *Id.* at 834.

Here, there is similar unrefuted evidence. Not only did Abercrombie present evidence of counterfeiting, the unwitting sale of which Fashion Shop has not disputed, there is testimony which demonstrates a substantial likelihood that the remaining merchandise was made or sold without Abercrombie's authorization. As Carriero testified, it would not be in the best interest of any of Abercrombie's approved manufacturers to produce unapproved merchandise, but it is impossible for Abercrombie to police all of the actions taken by its overseas manufacturers. Fashion Shop has not presented any evidence which shows the merchandise was manufactured or sold with Abercrombie's approval. Therefore, Judge Sargus' opinion in *Too, Inc.* is dispositive on the disposition of this category of clothing.

■ However, Judge Sargus was not presented with an arrangement such as the "Sell–Off Compliance Agreement," whereby the manufacturer is given authorization to sell rejected merchandise. It is this category of merchandise which creates the most difficulty. This is merchandise that Abercrombie has either inspected and rejected, or rejected for being late. However, this merchandise is approved for sale, subject to the terms of the "Sell–Off Compliance Agreement." Fashion Shop contends that the first sale doctrine applies to this merchandise as well. Abercrombie argues that even though this merchandise was approved for sale, it was not approved for sale in the United States.

As one district court in this circuit has explained, these goods are known as "gray goods;" products authorized under the plaintiff's mark for production and sale abroad that are brought into this country in violation of such understanding. *U-Haul Int'l, Inc. v. Kresch,* 904 F.Supp. 595, 600 (E.D.Mich.1995); *see also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 285, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("A gray-market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder.").

In *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 635 (1st Cir.1992), it was held that the scope of protection for "gray goods" turns on the degree of difference between the product

authorized for the domestic market and the allegedly infringing product. The First Circuit began its analysis by explaining:

> Two amaranthine principles fuel the Lanham Trade–Mark Act. One aims at protecting consumers. The other focuses on protecting registrants and their assignees. These interlocking principles, in turn, are linked to a concept of territorial exclusivity.

*Id.* at 636. The First Circuit recognized that "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent," but stated that this "maxim does not apply when genuine, but unauthorized, imports differ materially from authentic goods authorized for sale in the domestic market." *Id.* at 638.[13] The court explained that the unauthorized importation and sale of materially different merchandise was a trademark violation because a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill. *Id.,citing, Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.,* 816 F.2d 68, 73 (2d Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); *El Greco,* 806 F.2d at 395–96. Regarding the standard for materiality, the court stated:

> There is no mechanical way to determine the point at which a difference becomes "material." Separating wheat from chaff must be done on a case-by-case basis. Bearing in mind the policies and provisions of the Lanham Trade–Mark Act as they apply to gray goods,

we can confidently say that the threshold of materiality is always quite low in such cases.

*Id.* at 641. The court explained that "the threshold of materiality must be kept low enough to take account of potentially confusing differences-differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations." *Id.*

In *Original Appalachian Artworks, Inc.,* one of the decisions relied on by the First Circuit in *Nestle,* the Second Circuit made note of several cases where the courts ruled that there was no trademark infringement because the goods were "genuine," that is, "their production was authorized by contract, they were labeled with the trademark with the intent that they be sold in the United States, and they were sufficiently similar that they could not give rise to the confusion section 1114 was intended to prevent." 816 F.2d at 72–73, *citing, Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* 632 F.Supp. 1525, 1528–29 (surplus jeans manufactured overseas for sale in U.S.); *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.,* 707 F.2d 1054, 1058 (9th Cir.1983) (surplus shirts were "the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale"); *Diamond Supply Co. v. Prudential Paper Products Co.,* 589 F.Supp. 470, 475 (S.D.N.Y.1984) (paper products were produced under contract and "identical or qualitatively·equivalent"); *Ballet Makers, Inc. v. United States Shoe Corp.,* 633

---

**13.** As one commentator has explained: "This is only logical, because if one applied the 'first sale' or 'exhaustion' defense to gray goods sales, the unauthorized importer would never be an infringer, because an unauthorized importer is always a reseller of goods." 4 McCarthy on Trademarks and Unfair Competition § 29:51.2 (4th ed.). *See also Martin's*

*Herend Imports, Inc. v. Diamond & Gem Trading USA Co.,* 112 F.3d 1296 (5th Cir.1997) ("[A]pplying the first sale rule to an unauthorized importer such as [defendant] would mean that the gray-market importer would always escape liability, Unauthorized importers are never the first seller.")

F.Supp. 1328, 1334–35 (S.D.N.Y.1986) (subsequent licensee's use of trademark does not infringe prior licensee's rights when goods are "genuine" and owner approved both goods for U.S. distribution). However, the court distinguished these cases from the case before it because the defendant's dolls were not intended to be sold in the United States, and, most importantly, were materially different from the dolls sold in the United States. *Id.* at 73.

Abercrombie would have the Court read *Original Appalachian Artworks, Inc* to stand for the general proposition that the exhaustion doctrine does not apply when goods are sold in a foreign jurisdiction. However, as both the opinion and the concurring opinion make clear, it is the "confusion over the source of the product" which is dispositive, not solely the intended market. *Id.* at 74 (Cardamone, C.J., concurring).[14]

Other circuits have adopted the approach taken by the Second Circuit in *Original Appalachian Artworks, Inc* and the First Circuit in *Nestle: Davidoff & CIE, S.A. v. PLD Intern. Corp.,* 263 F.3d 1297, 1302 (11th Cir.2001) ("We follow our sister circuits and hold that the resale of a trademarked product that is materially different can constitute a trademark infringement."); *Iberia Foods v. Romeo,* 150 F.3d 298, 302–303 (3d Cir.1998) ("The test for whether an alleged infringer's products are genuine asks whether there are 'material differences' between the products sold by the trademark owner and those sold by the alleged infringer."); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.,* 112 F.3d 1296, 1301–302 (5th Cir.1997) ("We are persuaded that the *Nestle/OAA* test, which finds infringement if the goods sold by the authorized domestic distributor and the defendant's foreign goods are materially different, is a sound one, at least when the goods in question are highly artistic, luxury goods.").

The present case is not unlike the above cases because it is possible that some of the merchandise in the Fashion Shop stores is merchandise which was subject to the "Sell–Off Agreements." These would be "gray goods," that is to say, they were authorized under Abercrombie's mark for production and sale abroad, but were evidently brought into this country in violation of such understanding. Therefore, the Court must determine whether the

---

**14.** In his concurring opinion, the judge does make the point that one of the functions of trademark law is to guarantee the quality of the trademarked product, and territorial sales restrictions are a means of quality control. 816 F.2d at 75. The judge notes that "the necessity of providing a remedy against quality infringement by third-parties is particularly essential in a licensing arrangement because the Lanham Act imposes an affirmative duty upon the licensor to maintain quality control." *Id.* Yet, the judge stated that the guarantee function, "is not entirely free from doubt as a basis for issuing an injunction." *Id.* The judge noted that it had been argued that the importation of genuine but inferior goods of a foreign licensee is the fault of the trademark owner "in not exercising adequate supervision of the mark," and that its failure "should not be a justification for protecting it under the trademark laws for the situation it has created." *Id.,citing,* Vandenburgh, The Problem of Importation of Genuinely Marked Goods is Not a Trademark Problem, 49 Trade Mark Rptr. 707, 716 (1959) (emphasis in original); and *Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416, 419 (S.D.Fla.1983) (Criticizing mark owner for seeking federal trademark protection "to insulate itself from what it placed in motion itself through its own foreign manufacturing and distribution sources."). Nevertheless, the judge did not find this argument persuasive in the case before him because it was not clear that the plaintiff could not have prevented by contract the importation of the dolls by third-party distributors—the plaintiff's contract with its manufacturer prohibited selling dolls outside its Spanish-licensed territory, and further agreed to sell to only purchasers who also agreed not to sell outside that territory. *Id.*

merchandise approved for sale under a "Sell–Off Compliance Agreement" is materially different from that sold in Abercrombie stores.

As noted above, the threshold of materiality must be kept low enough to take account of potentially confusing differences. These differences may not be blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations. Abercrombie has presented evidence that it maintains strict standards of quality and appearance. Carriero testified that the goods authorized for sale under the "Sell–Off Agreements" did not meet these standards. While it may not be obvious to the average consumer, there could be potentially confusing differences in the construction of the garments and in the material used.[15] Moreover, all merchandise authorized for sell-off must be modified according to Abercrombie's requirements. For instance, all interior labels must be "black-lined" or "cut" through. Therefore, the merchandise approved for sale under a "Sell–Off Compliance Agreement" is materially different from that sold in Abercrombie stores.

In summary, Abercrombie has shown a likelihood of success on the merits. There is no dispute that the sale of the counterfeit goods is a violation of the Lanham Act. In addition, there is a substantial likelihood that the merchandise which is not counterfeit was made or sold without Abercrombie's authorization. Finally,

even if the merchandise which is not counterfeit is merchandise which was sold in violation of a "Sell–Off Agreement," this merchandise is materially different from the merchandise Abercrombie that sells within the United States, and it is likely that these differences cause customer confusion.

2. *Irreparable Injury.*

■ Irreparable injury is presumed as a result of a finding of a likelihood of confusion for purposes of the Lanham Act. *Too, Inc.*, 229 F.Supp.2d at 838; *Worthington Foods, Inc.*, 732 F.Supp. at 1460, *citing, Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1434 (S.D.Ohio 1989) and *Wendy's Int'l, Inc. v. Big Bite, Inc.*, 576 F.Supp. 816, 824 (S.D.Ohio 1983). Moreover, in the Sixth Circuit "no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir.1999), *citing, Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir.1991).

Fashion Shop argues that Abercrombie's delay in bringing this action undercuts any allegation of irreparable harm.

The Sixth Circuit has explained that:
the "Lanham Act does not contain a statute of limitations. In determining when a plaintiff's suit should be barred under the Act, courts have consistently used principles of laches as developed by

---

**15.** In *Warner–Lambert Co. v. Northside Development Corp.*, 86 F.3d 3, 4 (2d Cir.1996), the plaintiff had a policy of selling its cough drops within twenty-four months after their manufacture to ensure freshness. The defendant had sold plaintiff's cough drops more than twenty-four months old despite this policy. The Second Circuit held that the defendant had violated the Lanham Act:

Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement.

*Id.* at 6. While this case is a "repackaging" case, its holding is in keeping with one of the aims of the Lanham Act protecting registrants.

courts of equity." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir.1985). Unlike statutes of limitations, "laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946). Laches, rather than a state statute of limitations, governs claims brought to enforce an "equitable right created by Congress." *Id.* at 395, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743. *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550–51 (6th Cir.2003). To invoke the equitable doctrine of laches, a party must show: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 320 (6th Cir.2001).

In the Sixth Circuit, there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed. *Elvis Presley Enter., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991). The analogous statute of limitations in a trademark case is that for injury to personal property. *Herman Miller*, 270 F.3d at 321. Under Ohio law, that period is two years. Ohio Rev.Code § 2305.10. The period of delay begins to run when plaintiff had "actual or constructive knowledge of the alleged infringing activity." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002).

While Levine testified that Fashion Shop has been selling Abercrombie mer-

chandise for ten years, Braun testified that he learned in September of 2004 that Fashion Shop was selling Abercrombie merchandise in one of its stores in Louisville, Kentucky. While this may show actual knowledge, it does not resolve whether or when Abercrombie had constructive knowledge of Fashion Shop's activity.

Fashion Shop points out that it was operating a store immediately adjacent to an Abercrombie store in Louisville. However, no evidence was presented regarding how long these stores had been operating near one another. While there was testimony from Levine that a customer had been sent to Fashion Shop's store by an Abercrombie store employee to purchase Abercrombie merchandise, this evidence was hearsay evidence and does not show that anyone charged with trademark enforcement at Abercrombie should have known that Fashion Shop was selling potentially infringing merchandise.

Regarding any prejudice to Fashion Shop, while the loss of inventory could result in a loss of income, there was no evidence that this loss is any greater due to a delay in Abercrombie bringing its claims.

Accordingly, based on the evidence currently in the record this Court concludes that Abercrombie's claims are not barred by the equitable doctrine of laches because Abercrombie did not lack diligence in asserting its rights, and because Fashion Shop was not prejudiced by the timing of Abercrombie's lawsuit.

3. *Substantial Harm to Others.*[16]

■ Abercrombie states that Fashion Shop will not be harmed if it is enjoined

---

**16.** As this Court recognized in *NBBJ East Limited Partnership v. NBBJ Training Academy, Inc.*, 201 F.Supp.2d 800, 808 (S.D.Ohio 2001):

Although the Sixth Circuit defines this branch of the four-part test in terms of

harm to others . . . the focus is on the harm that a defendant will suffer if the requested injunctive relief is granted. It is with this factor that courts have traditionally balanced the equities. . . . *Shepard's Company v. The Thomson Corporation*, 1999 WL

from selling the allegedly infringing Abercrombie merchandise because Abercrombie would post a security bond. Federal Rule of Civil Procedure 65(c) states, in relevant part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

While a district court must consider whether security is appropriate, the decision is left to the sound discretion of the court. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir.1978); *see also Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

At the hearing, Levine estimated that the Abercrombie merchandise was comprised of between $150,000 and $300,000 in inventory. Accordingly, a bond in the amount of $150,000, posted in accordance with S.D. Civ. Ohio R. 67.1, would prevent any harm Fashion Shop may incur before the final resolution of this matter.

### 4. *Public Interest.*

■ Abercrombie argues that an injunction would protect the public from confusion, which is the paramount public policy underlying the Lanham Act. Accordingly, this Court has previously held that avoiding confusion in the marketplace by issuing an injunction would be in the public interest. *Worthington Foods, Inc.*, 732 F.Supp. at 1463, *citing, Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1435 (S.D.Ohio 1989). Therefore, the Court concludes that an injunction would serve the public interest in this case.

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' motion for a preliminary injunction is **GRANTED**.

**IT IS FURTHER ORDERED** that upon the posting of a $150,000 security bond by Abercrombie in accordance with S.D. Civ. Ohio R. 67.1, Fashion Shop is preliminary enjoined from selling any merchandise bearing the marks "ABERCROMBIE & FITCH," "A & F," and "HOLLISTER CO." Fashion Shop shall turn over any articles in its possession bearing the marks "ABERCROMBIE & FITCH," "A & F," and "HOLLISTER CO." to Abercrombie. This merchandise is to be examined by Plaintiffs and returned to Defendant within ten (10) days of their receipt thereof if the articles are determined by Plaintiffs to be neither counterfeit nor unauthorized.

This order shall remain in effect until further order of this Court.

**SO ORDERED.**