HER, INC., et al., Plaintiffs,

v.

RE/MAX FIRST CHOICE, LLC, et al., Defendants.

No. 206–CV–492.

United States District Court, S.D. Ohio, Eastern Division.

Jan. 5, 2007.

John F. Marsh, J. Kenneth Thien, Karen K. Hammond, Monique Bradley Lampke, Porter Wright Morris & Arthur, Columbus, OH, for Plaintiffs.

Charles William Hess, Charles William Hess, Dublin, OH, for Defendants.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court following a Hearing on the Plaintiffs' Request for Preliminary Injunction. For the reasons that follow, the relief sought by Plaintiffs is granted.

### I.

This case involves the intersection of the First Amendment's protection of free speech and the statutory prohibition on the misleading use of trademarks and tradenames. Because freedom of speech is an essential right in a free society, this opinion first addresses the interplay of First Amendment rights with the regulation of intellectual property rights.

The Lanham Act, 15 U.S.C. § 1125, enacted in 1946 and addressed in more detail below, prohibits commercial use of trademarks and tradenames likely to cause confusion as to the source of a product or service. The Lanham Act has never been extended to " 'quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view.' " *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir.2002), quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir.1987).

In 1999, Congress enacted the Anticybersquatting Consumer Protection Act ["ACPA"], 15 U.S.C. § 1125(d), as an amendment to the Lanham Act. The ACPA prohibits "cybersquatting," which occurs "when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit by either ransoming the domain name or by using the domain name to direct business from the trademark holder to the domain name holder." *DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 203 (6th Cir.2004), citing *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2nd Cir.2000).

Both of these statutes have the potential to infringe upon the First Amendment right of free speech. Because the Lanham Act is restricted to commercial speech, which is entitled to a lesser degree of protection, courts have rejected challenges to its constitutionality. *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 111–12 (6th Cir. 1995). Courts have also made clear that non-commercial critical commentary may lawfully include the tradename or trademark. In *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir.2003), the Court of Appeals held:

> The rooftops of our past have evolved into the internet domain names of our present. We find that the domain name is a type of public expression, no different in scope than a billboard or a pulpit, and [Defendant] has a First Amendment right to express his opinion about [Plaintiff], and as long as his speech is not commercially misleading, the Lanham Act cannot be summoned to prevent it.

The ACPA essentially adopts this same distinction. The statute prohibits a use of domain name which is identical or confusingly similar to a tradename or trademark not held by the domain name owner. The prohibited use, however, must involve "a bad faith intent to profit from that mark...." 15 U.S.C. § 1125(d)(1)(A). In *Coca–Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir.2004), the court held that the ACPA "was intended to balance the inter-

ests of trademark owners against the interests of those who would make fair uses of a mark online, such as for comment, criticism, parody, and news reporting."

As described in more detail below, the Defendants obtained ownership of domain names which are either identical or confusingly similar to trademarks and trade-names held by the Plaintiffs. Importantly, the Defendants are in head to head competition with the Plaintiffs regarding the sales of real estate in Central Ohio. Some of the speech communicated through the Defendants' domain sites is highly critical of the Plaintiffs. In essence, however, the domain names have been used in direct relationship to Defendants' real estate business and this use is not analogous to non-commercial, critical speech otherwise protected by the First Amendment.

## II.

Plaintiffs HER, Inc., Real Living, Inc., Harley E. Rouda, Jr., Kaira Sturdivant–Rouda and Harley E. Rouda, Sr. [collectively referred to as "Plaintiffs"], seek a preliminary injunction to prevent Defendants RE/MAX First Choice, LLC ["RE/MAX"] and David E. Barlow from using Internet domain names incorporating Plaintiffs' personal names and registered marks. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

Plaintiff HER is a Midwest real estate firm, which provides residential real estate brokerage services, real estate information and other related services to the public. (*Complaint* at ¶ 8). HER is incorporated under the laws of Ohio and its principal place of business is located in Columbus, Ohio. Plaintiffs Harley E. Rouda Jr., Kaira Sturdivant–Rouda and Harley E. Rouda, Sr. are residents of Franklin County, Ohio. (*Id.* at ¶¶ 1–3). Harley Rouda, Sr. is the founder of HER, and his initials "H.E.R."

are the source of the company's name. His son, Harley Rouda, Jr. is the current Chief Executive Officer, General Counsel and Managing Partner of Real Living, Inc. (*Id.* at ¶ 9). Kaira Sturdivant–Rouda is the Chief Operating Officer of Real Living, Inc. Harley Rouda, Jr. is her husband. (*Id.* at ¶ 15).

Since 1977, the term "HER" has been a registered trademark with the United States Patent and Trademark Office. (Pl. Exhibit 4). Plaintiffs' other registered trademarks include: "REAL LIVING, RELAX WITH REAL LIVING," and "IT'S GOT TO BE REAL." (Pl. Exhibits 5, 6). Plaintiffs assert that the names "Harley E. Rouda, Sr.," "Harley E. Rouda, Jr.," and "Kaira Sturdivant–Rouda" are synonymous with HER and REAL LIVING.

Defendant RE/MAX is a limited liability company organized under the laws of the State of Ohio. RE/MAX is a licensed real estate brokerage company. Defendant Barlow testified that he is a licensed real estate agent and that he was employed by Plaintiff Real Living, Inc. from 1998 to 2004. Barlow is currently an agent for Defendant RE/MAX, First Choice, LLC. (*Complaint* at ¶¶ 4–5).

This case arises as a result of circumstances which took place in late April and early May 2006, when agents of HER received an e-mail from "Herbie R Jr." ["Herbie"], using the e-mail address "herbie@INSIDEREALLIVING.COM." (*Stipulation* at ¶ 2). Plaintiffs claim that the e-mail was sent to nearly seven hundred HER real estate agents. The e-mail, entitled " 'Inside' Real Living 'and the Truth shall set you free,' " purported to be an insider's look into the dealings of HER and its leadership. The body of the message states:

Welcome to the first edition of "Inside" Real Living where from time to time we

will show you the "Inside" dealings and the back door deals of HER Real Living and it's [*sic*] leadership.

Did you know that the HER Real Living web site is one of the least accurate web sites on the Internet when it comes to having a complete inventory of homes available for your clients to see?

Yes it is true, your boss's [*sic*] Harley Jr and Kaira Sturdivant–Rouda pick and choose which of their competitors [*sic*] homes show up on their HER Real Living web site so when your clients are searching for their next home they will not see all homes in the MLS.

Listings by Top Agents Jack Travis, Patti Good, Dave Barlow and Susan Beckley just to name a few agents whose listings are not showing up on the HER web site because Harley Jr and Kaira Sturdivant–Rouda are playing games with your livelihood and have decided on your behalf not to display these top agent listings and many others [*sic*] agents who just like them have recently left HER.

It truly is sad, said one unidentified HER agent, that I have to tell my clients to go to another web site like Century21.com, REMAX.com or Kingthompson.com so my clients can see the all [*sic*] of the listings of homes available in Columbus.

I can't afford to tell my Clients to only use the HER web site when many of the best homes for sale are not even showing up. I'm am [*sic*] potentially losing money anytime I send one of my clients to the HER web site because my clients can't search the entire MLS.

The competition is finding the better homes quicker and beating my buyers to them because my clients who are using the HER web site are not even seeing some of the best homes on the market. Now I know why my numbers have been going down, because my clients are not even getting the whole picture because Harley Jr and Kaira Sturdivant–Rouda are playing games and acting like little kids holding some sort of grudge against former agents and it is costing me money!

It's hard enough to find your clients the perfect home without having your own company working against you. Don't let Harley Jr and Kaira Sturdivant–Rouda cheat your clients out of seeing the latest listings. Ask your Boss's [*sic*] to include all listings in the MLS on HER web site so your clients will have a chance at buying every home available in the MLS and you will have a chance to collect a commission check.

Now that you now know the truth, next time your clients ask which web site is the best web site to find homes on please go ahead and tell them to search on the Century 21, REMAX or King Thompson web sites, at least those web sites have all of the listings available for your clients to see & buy.

Now you know the Inside story. Stay tuned for further editions.

Your friend and insider

Herbie R Jr

(Pl. Exhibit 13).

Plaintiff Harley Rouda, Jr. testified during the Preliminary Injunction Hearing that after the May 2006 e-mail, he received numerous phone calls and e-mails inquiring as to the validity of the e-mail message. In response to the e-mail, HER asked Mark Williams, the Senior Systems Administrator for HER Real Living, Inc. to investigate the source of the "Inside" Real Living e-mails. Williams traced the e-mail to a computer named "Dads_laptop," which utilized a server provided by Time Warner/Road Runner high speed internet. After comparing the information

from e-mails sent by "Herbie" and those sent from the e-mail addresses "dbarlow@barlow.com" and "dave@firstchoice.columbus.rr.com," Williams concluded that the Herbie Jr e-mails had originated from the same computer as the e-mails sent from "dbarlow@barlow.com" and "dave@firstchoice.columbus.rr.com."

In early June 2006, agents of HER received a second e-mail, similar to the first. The sender, however, had altered certain information, which bypassed HER's e-mail security settings. The sender this time was "HJR," and the corresponding e-mail address was, "herbie@INSIDER REALLIVING.COM." (Pl. Exhibit 14). The second e-mail emphasized a phrase on the HER website, which stated, "See all homes for sale—Not just our listings." The second e-mail restated an allegation made in the first e-mail, namely that HER's advertisement was "a lie" because HER had deleted the listings of RE/MAX agents Jack Travis, Dave Barlow, Patty Good and Susan Beckley as well as those of 150 other agents from RE/MAX Town Center. (Id.).

Following the June 2006 e-mail from "Herbie," HER changed the complained of advertisement from "see all the homes" to "see virtually all the homes." Plaintiffs assert that the e-mails sent by "Herbie" were false in stating that HER was not listing the information for properties listed for sale by agents Jack Travis, Patti Good and Susan Beckley. (Pl. Exhibit 21).

Defendant Barlow concedes that he was responsible for the "Inside Real Living" e-mails sent from the computer named "Dads_laptop." (Stipulation at ¶ 2). Barlow also admits that he registered and used the Internet domain name "www.

insiderealliving.com," which displayed the same information embedded within the e-mail from "Herbie R Jr." (Stipulation at ¶ 1). In addition to the "www.inside realliving.com" website, Barlow has registered the following domain names: "www.harleyroudajr.com, www.harleyerouda.com, www.harleyroudasr.com, www.kaira rouda.com and www.kairasturdivantrouda.com." (Id.). Plaintiff Harley Rouda, Jr. testified that when a user visited one of these website domains, he or she would be diverted to the website of Defendant RE/MAX First Choice. This testimony describing the diversion to the RE/MAX website is undisputed, although Barlow testified that the diversion was unintentional.

Rouda also testified that if a person were attempting to reach his actual website, which is "www.harleyrouda.com," [1] such person might accidentally type the wrong domain address and find him or herself at the RE/MAX website. Plaintiff also expressed concern that consumers would confuse Barlow's website www.insiderealliving.com with HER's web site: "www.realliving.com." While this testimony is somewhat speculative, the similarity of the domain names is undeniable. Defendant Barlow testified that he did not intend for the domain names he registered to be routed to his RE/MAX First Choice website. According to Barlow, the domain names were intended to link to the "insiderealliving" website.

Barlow testified that he registered the domain names at issue in February 2006 through the website "1+1.com." Barlow has also registered the following domain names:

(1) www.harleyandkaira.com,

---

**1.** Unlike the domain addresses that Barlow registered, Harley Rouda, Jr.'s actual website address lacks the insertion of his middle initial "e" or the suffixes "jr," or "sr." As discussed *infra,* this does not preclude the domain name from being confusingly similar to the Plaintiffs' marks.

(2) www.kairaandharleysittinginatree. com,

(3) www.6143951999.com,

(4) www.3951999.com,

(5) www.6148320223.com,

(6) www.8320223.com,

(7) www.6142736004.com,

(8) www.2736004.com,

(9) www.2285yorkshire.com,

(10) www.2285yorkshireroad.com, and

(11) www.2285yorkshirerd.com.

(Pl. Exhibit 16). Domain names (3)—(8) contain the cell phone and work numbers of Harley Rouda, Jr. and Kaira Sturdivant–Rouda. Domains (9)—(11) contain the Roudas' home address.

Plaintiffs originally filed their Complaint in the Court of Common Pleas for Franklin County, Ohio, bringing claims against Defendants for violation of the anti-cybersquatting provision under § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); federal unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); service mark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; federal dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); tortious interference with contractual, business and employment relationships under Ohio law; deceptive trade practice under R.C. 4165.02; defamation under Ohio law; common law infringement and unfair competition; common law dilution; and misappropriation and unjust enrichment. (*Complaint* at ¶ 6). Plaintiffs obtained a Temporary Restraining Order in state court. The case was later removed to this Court with the request for Preliminary Injunction pending.

Defendants contend that the sole use of the domain names in question is to provide legitimate criticism of Plaintiffs for alleged misrepresentations on the HER web site. Defendants deny that they have cybers-

quatted and further argue that Defendant Barlow's actions amount to a legitimate exercise of the First Amendment right to Free Speech.

With this background in mind, the Court considers Plaintiffs' request for preliminary injunctive relief.

### III.

#### A. Standard of Review.

In considering a request for Preliminary Injunction, the district court is to consider the following: (1) the likelihood that the movant will succeed on the merits, (2) whether the movant will suffer irreparable harm without the injunction, (3) the probability that granting the injunction will cause substantial harm to others and (4) whether the public interest will be advanced by issuing the injunction. *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006), citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir.1997). "In making its determination, the 'district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue.'" *Id.* Nevertheless, the foregoing are "factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

#### B. Analysis.

*Claim for Violation of the ACPA*

##### 1. Likelihood of Success on the Merits

The Court first considers whether Plaintiffs are likely to succeed on the merits of their claim under the Anti–Cybers-

quatting Consumer Protection Act ["ACPA"], 15 U.S.C. § 1125(d), which states, in relevant part:

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A). The ACPA, which prohibits "cybersquatting," is an amendment to the Lanham Act. In order to successfully establish a claim for violation of the statute, the Plaintiffs must show: (1) they have a valid trademark entitled to protection; (2) the mark is distinctive or famous; (3) the Defendants' domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the Defendants used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. *Id.*, citing *Ford Motor Co.*

*v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003).

■ With regard to the first element, the Court finds that Plaintiffs have valid trademarks which are entitled to protection. It is undisputed that HER was registered as a trademark in 1977. (Pl. Exhibit 4). From the evidence presented, the Court finds that the name "HER" is readily identifiable as the trademark of one of the largest real estate companies in Central Ohio. REAL LIVING was registered as a trademark on December 20, 2005. (Pl. Exhibit 5). This name too is readily identifiable as the trademark of the same real estate company. Further, for purposes of this motion, the Court finds that the personal names of Plaintiffs, Harley E. Rouda, Sr., Harley E. Rouda, Jr. and Kaira Sturdivant–Rouda, are worthy of trademark protection. Although personal names ordinarily are not protected, they become distinctive and worthy of protection by trademark law if there is proof that the names have attained secondary meaning, *i.e.,* a "long association of the [personal] name with the business ... [making] the name and the business become synonymous in the public mind...." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 13:2 (4th ed.2004). In this case, Plaintiffs presented evidence that their names are personally recognized by the public as being synonymous with the HER real estate business.[2] The evidence demonstrates that the names of the individual Plaintiffs have been regularly and frequently used in extensive marketing of HER and Real Living and the names have acquired secondary meaning, at least within the Central Ohio real estate market. The evidence presented at the Preliminary Injunction Hearing also shows

---

**2.** HER denotes the initials of both Harley E. Rouda, Sr. and Harley E. Rouda, Jr. Kaira Sturdivant–Rouda's name is associated with the Real Living brand, which she began in September 2002. Her resume and name appear on the website. (Pl. Exhibit 2).

that Real Living has acquired a secondary meaning by which consumers associate it with a particular provider or source—HER real estate. The Court concludes that HER, REAL LIVING, and the Plaintiffs' personal names are worthy of trademark protection.[3]

As to the second element, the Court finds sufficient evidence to show that the Plaintiffs' marks are distinctive or famous. The HER mark and the REAL LIVING mark, which are registered, are clearly distinctive. In addition, the Plaintiffs' personal names are distinctive by virtue of the secondary meaning they have acquired. A mark is distinctive and capable of protection by the trademark law if it is either "inherently distinctive" or it "has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

The third element for the Court to consider is whether the Defendants' domain names are identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's marks. In making this determination, the Court is to make a "direct comparison between the protected mark and the domain name itself," rather than an assessment of the context in which each is used or the content of the offending web site. *Northern Light Technology v. Northern Lights Club,* 97 F.Supp.2d 96, 117 (D.Mass.2000). This Court has little difficulty finding that the domain names used by Defendants are confusingly similar to and dilutive of Plaintiffs' marks. The Defendants' domain names identified in the Complaint are: "www.insiderealliving. com;" "www.harleyroudajr.com;" "www. harleyerouda.com;" "www.harleyroudasr. com;" "www.kairarouda.com;" and "www. kairasturdivantrouda.com." Defendants' use of the Plaintiffs' personal names as well as the Real Living mark is clearly confusing as it creates the appearance that Plaintiffs have permitted the use of the trademarks and names by the Defendants. The use also dilutes the Plaintiffs' marks. The Court rejects Defendant Barlow's argument that the addition of the word "inside" to the "realliving" domain name eliminates confusion. Furthermore, evidence was presented demonstrating that at least some users were actually confused by the "insiderealliving" site.

The fourth element of a claim under the ACPA is that the Defendants used, registered, or trafficked in the domain name. This element is clearly satisfied as it is undisputed that Defendants used, registered and trafficked in the foregoing domain names.

The fifth element is whether the Defendants' use was done with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i) outlines the factors for the Court to consider in determining whether a bad faith intent to profit is shown:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

---

**3.** The Court notes that Defendant Barlow has also registered domain names using Plaintiffs' first names: "www.harleyandkaira.com" and "www.kairaandharleysittinginatree.com." Plaintiffs have not moved for injunctive relief as to these domain sites. In addition, Barlow has registered domain names using the Plaintiffs' telephone numbers and street address. While these registrations appear to have no legitimate purpose, the Court is not convinced, and there has been no evidence adduced to show, that the Plaintiffs' telephone numbers and street address are worthy of trademark protection.

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name

registration is or is not distinctive and famous within the meaning of [the Act]. 15 U.S.C. § 1125(d)(1)(B)(i). The foregoing factors are not exhaustive of the analysis of whether Defendants acted with a bad faith intent to profit. The Court may also consider "unique circumstances ... which do not fit neatly into the specific factors enumerated by Congress." *Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2nd Cir.2000).

As to the first factor, the undisputed evidence shows that Defendants have no intellectual property right in the domain names. Second, the domain names consist of the Plaintiffs' business or personal names. Third, Defendants had no prior use of the domain names for a bona fide offering of goods or services. As observed in *Victoria's Secret Stores v. Artco Equipment Co., Inc.,* 194 F.Supp.2d 704, 722 (S.D.Ohio 2002) (Smith, J.), quoting *E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1675 (E.D.Cal.1989), "a presumption of bad faith arises in a situation such as this where 'the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame.... In these cases, 'it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark."'

As to the fourth factor, Defendants have criticized the Plaintiffs, but only in conjunction with commercially related speech. The Defendants arguably have shown a bona fide noncommercial use in exercising their constitutional right to criticize Plaintiffs' method of business. In the circumstances of this case, however, the Court finds this factor does not weigh in favor of the Defendants, not because their First Amendment rights are to be trivialized, but by the fact that "bona fide" at least implies a legitimate, noncommercial pur-

pose. Because the Defendants are in direct business competition with the Plaintiffs, and the use of the trademarks and tradenames has been directly related to Defendants' business, it is difficult to see how this factor weighs in favor of the Defendants.

With regard to the fifth factor, the evidence demonstrates that Defendants diverted at least some users to a site accessible through the domain name in a manner that could harm the goodwill of Plaintiffs' marks by creating confusion as to the source of the domain names. Defendant Barlow contends that he did not intend to divert users to the RE/MAX website. According to Defendant Barlow, he intended the domain names to lead users to the "www.insiderealliving.com" website. (*Def. Post–Hearing Brief* at 2). In the Court's view, the effect of routing users to either the RE/MAX site or the "insiderealliving" site is the same. The diversion creates confusion because the domain names used are identical to or nearly identical to the Plaintiffs' personal and professional names. Users intending to view the Plaintiffs' websites could be, and in some instances were, unknowingly diverted to Defendants' website. This diversion serves to harm the goodwill of Plaintiffs' marks.

The fifth factor also considers the extent to which the diversion to Defendants' website was done for commercial gain. Since Defendant was displeased that his real estate listings were not on the HER website, Plaintiffs contend that the diversion was done for commercial gain. In particular, Defendant Barlow stated in an e-mail sent to all agents working for HER that he was "potentially losing money anytime I send one of my clients to the HER website . . .

[n]ow I know why my numbers have been going down. . . ." (Pl. Exhibits 11 and 13). Nonetheless, Defendant Barlow contends that commercial gain was not his goal. Rather, he simply wanted to reveal that the HER website was inaccurate, because not all the homes for sale could be viewed by accessing the Plaintiffs' website. In the Court's view, Barlow was simply displeased with the detrimental, economic effect on him and RE/MAX of not having their homes for sale listed on the HER website. The evidence shows that the Defendants had at least the hope of achieving some commercial gain. Irrespective of any gain which may or may not have been realized, the Court observes that the fifth factor does not necessarily require a showing of commercial gain. The statute states that the diversion can be "either for commercial gain or with the intent to tarnish or disparage the mark . . ." in order to show a bad faith intent to profit. 15 U.S.C. § 1125(d)(4)(B)(i)(V). The Court finds that the site was designed with a long-term financial motive in mind.

As to the sixth factor, there is no evidence that the Defendants offered to transfer, sell, or otherwise assign the domain names to the Plaintiffs for financial gain.[4] Regarding the seventh factor, the evidence of record is not conclusive as to whether the Defendants used false or misleading information when applying for registration of the domain names. With respect to the eighth factor, there is ample evidence that, at the time Defendant Barlow registered the multiple domain names, he knew they were distinctive of Plaintiffs' marks and personal identity, without regard to the goods or services of the parties. As to the ninth factor, it is clear that

---

**4.** The Court disagrees with Defendant Barlow that the absence of evidence in this regard precludes a showing of cybersquatting under the ACPA. No single factor can determine

whether Defendants acted with a bad faith intent to profit. *Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2nd Cir.2000).

the Plaintiffs' marks are distinctive or famous.

■ Defendant Barlow contends that the conduct complained of in this case is protected by the First Amendment. Defendant Barlow maintains that he created the domain names to criticize Plaintiffs for failing to include some 171 real estate listings on the HER website. According to Defendant Barlow, he has a First Amendment right to point out that the Plaintiffs allegedly acted untruthfully in stating that they listed "all" the homes for sale.

As recently explained by the Eighth Circuit in *Coca–Cola Co. v. Purdy,* 382 F.3d 774, 778 (8th Cir.2004):

> Congress enacted the ACPA to provide legal clarity for trademark owners by prohibiting bad faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from their goodwill. [S.Rep. No. 106–140] at *4. The ACPA was intended to balance the interests of trademark owners against the interests of those who would make fair uses of a mark online, such as for comment, criticism, parody, and news reporting. Id. at *8.

As the Eighth Circuit noted, the issue is not whether Defendant has a First Amendment right to criticize Plaintiffs, but whether the First Amendment protects "a misleading use of plaintiffs' marks in domain names to attract an unwitting and possibly unwilling audience to [Plaintiff's] message." *Id.* at 787. In the *Purdy* case, the Eighth Circuit concluded that, while Defendant had a right to criticize Plaintiffs by using the Internet, he did not have a First Amendment right to appropriate Plaintiffs' marks in order to "spread his protest message by confusing Internet users into thinking that they are entering one of the plaintiffs' websites." *Id.* at 788, citing 4 McCarthy § 25:76.

In contrast is the Sixth Circuit case of *Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir.2003). There, the Defendant registered a domain name using the name of a shopping mall being built by Plaintiff in the State of Michigan. Defendant, which had no connection with the Plaintiff or its business, registered the domain name "shopsatwillowbend.com" to feature information about the mall and links to websites for tenant stores. The Defendant's website had a disclaimer noting that the site was unofficial. The site did, however, provide a link to a website from which Defendant's girlfriend sold custom-made shirts. Upon learning of the Defendant's website, the Plaintiff requested that Defendant remove the site from the Internet. Defendant did not do so and registered five additional domain names: "taubman sucks.com;" "shopsatwillowbendsucks. com;" "theshopsatwillowbendsucks.com;" "willowbendmallsucks.com;" and "willowbendsucks.com."

For purposes of Plaintiff's request for preliminary injunction on a Lanham Act trademark infringement claim, 15 U.S.C. § 1114(1), the Sixth Circuit held that the domain name "shopsatwillowbend.com" did not infringe on Plaintiff's mark, because Defendant removed the links to other businesses, making use of the site noncommercial. The court further held that, even if the site was commercial, the use of a disclaimer on the site negated the likelihood of confusion by a consumer. As for the domain names containing the word "sucks," the Sixth Circuit held that Defendant's use of the sites was not a violation of the Lanham Act. The Court observed that, although the Defendant may have intended to harm the Plaintiff economically, "the First Amendment protects critical commentary when there is no confusion as to source, even when it involves the criticism of a business." *Id.* at 778.

In this case, it is beyond dispute that Defendant Barlow has a right to criticize the Plaintiffs. Speech is not, however, entitled to First Amendment protection when the Defendants engage in a commercially misleading use of Plaintiffs' marks. The domain names which Defendant Barlow has used give no indication that they are not associated with the Plaintiffs, either personally or professionally. Importantly, the Defendants are also direct competitors of the Plaintiffs. Furthermore, unlike the explicitly critical names found in *Taubman,* the domain names here do not clearly indicate that they reference speech which is critical of Plaintiffs. The addition of the word "inside" to Plaintiffs' registered trademark of Real Living ("www.insiderealliving.com") does not eliminate the confusion as to the source of the contents of the site. The name "insiderealliving.com" is sufficiently similar to Plaintiffs' to cause confusion. Defendant Barlow's use of the domain names is commercially misleading and, as a result, the Court finds that there is a likelihood of confusion as to the source. The Court concludes that the Plaintiffs are likely to prevail on their claim for violation of the ACPA.[5]

## 2. Irreparable Harm

■ Since the Court concludes that the Plaintiffs are likely to succeed on their claim for violation of the ACPA, the Court next considers whether Plaintiffs would suffer irreparable harm if an injunction did not issue. The Sixth Circuit requires no particular finding in this regard. Ordinarily, "irreparable injury ... 'follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir.1999), quoting *Wynn Oil Co. v. Am. Way Serv. Corp.,* 943 F.2d 595, 599 (6th Cir.1991). As noted *supra,* the Court finds a likelihood of confusion as a result of the Defendants' use of the domain names. Thus, the Court concludes that Plaintiffs will suffer irreparable harm if the Court does not enjoin the Defendants' operation of the domain names and linked sites.

## 3. Substantial Harm to Others

The third factor is whether the issuance of an injunction would cause substantial harm to others. This factor, in essence, requires that the Court balance the harm that Plaintiffs would suffer in the absence of an injunction with the harm that the Defendant will suffer if an injunction is issued. *NBBJ East Limited Partnership v. NBBJ Training Academy, Inc.,* 201 F.Supp.2d 800, 808–09 (S.D.Ohio 2001). The Court finds that Defendant's misleading use of Plaintiffs' marks causes substantially more harm to Plaintiffs, if not enjoined, than any harm which would befall the Defendant if an injunction is issued.

---

**5.** In reaching this conclusion, the Court finds the case of *Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806 (6th Cir.2004), on which Defendant relies, distinguishable. There, Defendant Michelle Grosse registered the domain name "lucasnursery.com" to link to a website expressing her dissatisfaction with landscape work performed by Plaintiff Lucas Nursery and Landscaping, Inc. The Sixth Circuit held that Defendant did not act with a bad faith intent to profit for purposes of the ACPA. Important to the analysis was the fact that Defendant registered only one domain name and Plaintiff did not have a web site, thereby negating any evidence of intent on Defendant's part to divert consumers. Moreover, the Defendant was not in business competition with the Plaintiff. In contrast, in the case at bar, Defendant Barlow registered multiple domain names. Further, it is undisputed that a large portion of Plaintiffs' business is dependent upon links to real estate listings on the Internet through the site "www.realliving.com." The *Lucas Nursery* case is also distinguishable because the Plaintiff there had no trademark registration.

The Defendants are certainly free to criticize the Plaintiffs without fear of consequence; what they cannot do, particularly as competitors of Plaintiffs, is appropriate and misuse a registered trademark.

### 4. Public Interest

As to the final factor for consideration, the Court finds that there is a strong public interest in favor of enjoining Defendants from the use of the domain names at issue. *See e.g., Ameritech, Inc. v. Am. Info. Techs. Corp.,* 811 F.2d 960, 964 (6th Cir.1987) (holding that there is a public interest in preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark). Defendant Barlow's use of the Plaintiffs' personal and professional names is misleading and the Court concludes that enjoining this use serves the public interest.

### *Additional Claims*

In addition to their claim under the ACPA, Plaintiffs also seek preliminary injunctive relief for the Defendants' alleged violations of § 32 of the Lanham Act, 15 U.S.C. § 1114, and the Ohio Deceptive Trade Practices Act, R.C. § 4165.02(A)(2),(3) and (10).

### *§ 32    Lanham Act*

■] A claim for trademark infringement under § 1114 requires a showing of the following: (1) ownership of a valid, protectable trademark; (2) that Defendant used the mark in commerce and without the registrant's consent; and (3) there is a likelihood of consumer confusion. *Too, Inc. v. TJX Cos.,* 229 F.Supp.2d 825, 829

(S.D.Ohio 2002). The registrant does not need to prove intent in order establish liability. *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.,* 363 F.Supp.2d 952, 957 (S.D.Ohio 2005) (Watson, J.).

In considering whether there is a "likelihood of confusion," the Court examines the following eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.1982). The foregoing factors " 'imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.' " *Abercrombie & Fitch,* 363 F.Supp.2d at 959, quoting *PACCAR Inc. v. TeleScan Technologies, L.L.C.,* 319 F.3d 243, 249–50 (6th Cir.2003). The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 280 (6th Cir.1997).

■] The undisputed evidence shows that Plaintiffs have a valid, protectable mark and that Defendant Barlow used the mark in commerce without the Plaintiffs' consent.[6] As for the issue of likelihood of confusion, the Court finds that the Plaintiffs are likely to succeed in establishing

---

**6.** Under the Lanham Act, the Plaintiffs must prove that the Defendants used their trademarked names "in connection with the sale of goods and services." 15 U.S.C. § 1114. This requirement is not found in the ACPA. While the Court finds that the marks were used by the Defendants in connection with the sale of goods and services, the offered proof in support of this element is not as strong as Plaintiffs' showing under the ACPA, which requires only that the use be undertaken with "a bad faith intent to profit from the mark...." 15 U.S.C. § 1125(d)(1)(A)(i).

this element. As to the first factor, the Plaintiffs are owners of a strong mark; second, the parties are both involved the sale of real estate; third, the domain names used by Defendant Barlow are similar, if not nearly identical, to the Plaintiffs' personal names and marks; fourth, there is evidence of actual confusion by those who received Defendant Barlow's e-mails; fifth, the parties use the same marketing channels; sixth, users are unlikely to know that Defendant Barlow's use of domain names was not authorized by Plaintiffs; and seventh, Defendant Barlow selected the domain names to be similar if not identical to Plaintiffs' names and marks. The eighth factor, likelihood of expansion of the product lines, is inapplicable to this case.

The Court concludes, for purposes of preliminary injunctive relief, that Plaintiffs are likely to succeed in establishing a violation of § 32 of the Lanham Act. With respect to the remaining factors, the Court also concludes that irreparable harm will occur if the Court does not issue a preliminary injunction; that the Plaintiffs would suffer greater harm than Defendants if an injunction were not issued; and that the public interest is served by the issuance of an injunction.

**Ohio Deceptive Trade Practices Act**

■ Plaintiffs also request preliminary injunctive relief for the Defendants' alleged violation of the Ohio Deceptive Trade Practices Act. A person engages in a deceptive trade practice when he or she:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, con-

nection, or association with, or certification by, another;

. . . .

(10) Disparages the goods, services or business of another by false representation of fact.

R.C. § 4165.02(A). "'The Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act [15 U.S.C. § 1125(a) ].... In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1431 (S.D.Ohio 1990) (Kinneary, J.) (citations omitted).

■ In order to succeed on a claim for false and misleading advertising under the Ohio Deceptive Trade Practices Act, the Plaintiff must show:

(1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Reed Elsevier, Inc. v. TheLaw.net Corp.*, 269 F.Supp.2d 942, 951 (S.D.Ohio 2003) (Rice, J.), citing *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir.1999); *Cesare v. Work*, 36 Ohio App.3d 26, 520 N.E.2d 586 (1987).

For purposes of preliminary injunctive relief, the Court concludes that the record is not sufficiently developed to determine whether Plaintiffs are likely to succeed on their claim under the Ohio Deceptive

Trade Practices Act. The Plaintiffs contend that Defendant Barlow's e-mail criticizing Plaintiffs for allegedly not including the real estate listings of certain agents is a false or misleading statement. Even if Defendant Barlow's statement is false or misleading, the record is devoid of evidence to show that the statement would likely influence purchasing decisions of consumers or that there is harm to Plaintiffs as a result of the statement. As a consequence, the Court declines to issue an injunction based on Defendants' alleged violation of R.C. § 4165.02(A).

### III.

For the foregoing reasons, the Plaintiffs' Request for Preliminary Injunction is **GRANTED.** Defendant Barlow and Defendant RE/MAX First Choice, LLC are hereby **PRELIMINARY ENJOINED** from the use of the following domain names:

(1) www.harleyroudajr.com

(2) www.harleyerouda.com

(3) www.harleyroudasr.com

(4) www.kairarouda.com

(5) www.kairasturdivantrouda.com

(6) www.insiderealliving.com

   **IT IS SO ORDERED.**